[No. 4781.]

## In re Estate of Peter Magnes.

BROWN, ADMINISTRATOR, v. ELDER, AS TREASURER OF
THE CITY AND COUNTY OF DENVER.

1. **Revenue—Inheritance Tax—Constitutional Law.**

The provisions of the general revenue act of 1902 (Session Laws of 1902, page 49), providing for a tax upon inheritances, legacies and devises, are not obnoxious to section 3, article X, of the constitution requiring all taxes to be uniform upon the same class of subjects, nor to section 11, article X, limiting the rate of taxation to four mills on each dollar of valuation.

2. **Same—Title of Act.**

The provisions of the general revenue act of 1902, known as the inheritance tax provisions, are not in violation of section 21, article V, of the constitution, providing that "no bill, except general appropriation bills shall be passed containing more than one subject, which shall be clearly expressed in its title." Said inheritance tax provisions do not embrace a separate and distinct subject from the one expressed in the title, and the title is sufficiently broad to include said provisions and is not so general as to be misleading.

3. **Same—Law of Descent.**

The provisions of the general revenue act of 1902, known as the inheritance tax provisions, do not change the law of descent so as to be in violation of section 25, article V, of the constitution, which prohibits the enactment of any local or special law changing the law of descent.

*Error to the County Court of the City and County of Denver.*

Mr. H. W. SPANGLER, for plaintiff in error.

Mr. N. C. MILLER, attorney general, for defendant in error.

Mr. JUSTICE CAMPBELL delivered the opinion of the court.

The sole question for determination is whether the so-called inheritance tax law of this state is valid. It is said to contravene several provisions of our

state and federal constitutions. As throwing light upon the object of this legislation, and as pertinent to some of the objections made to it, a brief reference to the history of the state's financial condition and standing will be helpful.

By section 11 of article X of our constitution, as originally adopted, the minimum rate of taxation on property for state purposes was two, and the maximum rate six mills on each dollar of valuation, depending upon the amount of taxable property within the state. As amended in 1891 (Session Laws 1891, p. 89), which amendment is still in force, such rate can never exceed four mills on each dollar of valuation.

From the beginning of our state history down to the year 1901 the public revenue received into the state treasury for state purposes was not sufficient to meet the expenses of the three great departments of government and to provide an adequate support for the different state institutions. Whether the shortage was due to excessive appropriations, or to failure of the executive assessing officers to fix the valuations, as the laws require, it is neither profitable to inquire nor necessary to determine. It is enough for our present purpose to say that different governors of the state and its various executive officers and the courts have repeatedly called to the attention of the general assembly the annual deficits in the state revenues and suggested methods for liquidating, and preventing a recurrence of the same. At one session of the general assembly a plan was adopted for lowering the rate which counties might levy for county purposes, the thought being that such limitation would result in increased valuations of property which would inure to the benefit of the state. If such plan had been adhered to and the rate kept sufficiently low, the financial situation might have been relieved;

but at the close of the fiscal year of 1900 the state's financial statement was unsatisfactory. There were then outstanding obligations of the state, evidenced by defaulted warrants and certificates of indebtedness, in large amount, bearing interest at more than the then legal rate, which could not be paid, and it seemed practically impossible to get sufficient revenue from a direct tax on property even to pay current expenses of the government, much less to take up these matured obligations. Such was the condition that confronted the Thirteenth General Assembly when it convened in January, 1901. To meet and remedy it that body passed a comprehensive revenue measure, the chief object of which was to provide adequate funds for state purposes. Because of imperfections in the act pointed out by the courts, apparently by general consent of the different departments the act was deemed invalid, and so, the emergency being great, the governor convened the general assembly in special session in 1902, and, as appears from his proclamation and message thereafter submitted, the primary object of the call was to enable the general assembly to provide ways and means for securing more revenue for the general purposes of the state. At such special session there was introduced and passed by the general assembly a comprehensive revenue measure entitled ''An Act in relation to Public Revenue.'' Included therein from sections 21 to 41, both inclusive, are what constitute our present so-called inheritance tax provisions, which are the subject of attack in this case.

These particular sections, though once declared by this court objectionable legislation (*In re Inheritance Tax*, 23 Colo. 492), were taken bodily from the statute of Illinois and after the same had been construed by the supreme court of that state and held constitutional under provisions substantially the same

as our own. By section 21 of this act, "All property, real, personal and mixed, which shall pass by will or by the intestate laws of this state from any person who may die, seized or possessed of the same while a resident of this state,  *  *  *  is subject to a tax at the rate hereinafter specified," and all persons so receiving such property in whatever capacity are made liable for the tax until the same is paid. The section provides that when the beneficial interests shall pass to or for the use of "any father, mother, husband, wife, child, brother, sister, wife or widow of the son or the husband of the daughter" or to an adopted child, or to one to whom the deceased stood in the acknowledged relation of a parent, or to any lineal descendant, the rate of tax shall be two dollars on every hundred dollars of the clear market value of such property so received; provided that the sum of ten thousand dollars of any such estate shall not be subject to any such duty or taxes, and only the amount in excess of ten thousand dollars shall be subject thereto.

When the beneficial interests to any property or income therefrom shall pass to or for the use of any uncle, aunt, niece, nephew, or any lineal descendant of the same, the tax is three dollars on every hundred dollars; and in all other cases on every hundred dollars of the clear market value of what passes and at the same rate for any less amount, on all estates of ten thousand dollars and less, three dollars; on all estates of over ten thousand dollars and not exceeding twenty thousand dollars, four dollars; on all estates over twenty thousand dollars and not exceeding fifty thousand dollars, five dollars, and on all estates over fifty thousand dollars, six dollars; and there is a proviso that where the estate is of a less value than five hundred dollars it shall not be subject to any duty or tax at all.

Section 22 provides that "when any person shall bequeath or devise any property or interest therein or income therefrom to mother, father, husband, wife, brother, sister, the widow of the son, husband of the daughter, or a lineal descendant during the life or for a term of years and remainder to the collateral heir of the decedent, or to the stranger in blood or to the body politic or corporate at their decease, or on the expiration of such term, the said life estate or estates for a term of years shall not be subject to any tax, and the property so passing shall be appraised immediately after the death at what was the fair market value thereof at the time of the death of the decedent, * * * and after deducting therefrom the value of said life estate, or term of years, the tax prescribed by this act on the remainder shall be immediately due and payable to the treasurer of the proper county." There is a proviso that persons beneficially interested, if they elect not to pay the same until they shall come into the actual possession and enjoyment, shall give bond for securing the payment of the amount due when they do come into possession. The other sections are purely administrative in character and are not material to this review.

1. The tax herein imposed is attacked upon the ground that it lacks the elements of uniformity and equality which section 3 of article X was intended to secure, and is in excess of the limited rate of four mills on each dollar of valuation which, as it is said, the general assembly may not, under section 11 of the same article of our constitution, exceed in securing revenue for general state purposes. In the late case of *Parsons v. The People, ante,* p. 221, it was held that section 3 applies only to taxes upon property, and not to a privilege or occupaton tax, and that in raising revenue for state purposes the general assembly is not restricted to a tax on property at the limited rate

of four mills prescribed by section 11, but may select other subjects of taxation, such as occupations and privileges. A careful investigation will disclose that, with few exceptions, where similar questions have been raised in other states and in the supreme court of the United States, an inheritance or succession tax has been held not to come within the purview of the uniformity and equality clause of state constitutions, and that the power to impose the same is to be found in the sovereign power of taxation which the state possesses to the fullest degree except as limited in its organic act. In these decisions substantially every objection as to the lack of uniformity and equality and the alleged arbitrary and unjust discriminations which these provisions are said to exhibit, and that they contravene various sections of our bill of rights affecting the property rights of citizens, have been considered and decided adversely to the contention of counsel for plaintiff in error. It is not necessary for us to make an argument in support of their validity, and, if we should do so, the result would be largely a repetition of the reasoning of the supreme court of the United States and of many state tribunals. We shall content ourselves merely with the general statement taken from the opinion of the supreme court of the United States in *Magoun v. Ills. Trust & Sav. Bank,* 170 U. S. 283, in which the decree of the circuit court of the United States for the district of Illinois upholding the validity of the act of which ours is a substantial copy was affirmed, that the constitutionality of such taxes is based upon two principles: *First,* an inheritance tax is not one on property, but one on the succession; *second,* the right to take property by devise or descent is a creature of the law, and not a natural right, and therefore the authority which confers it may impose conditions upon it. From these principles it is deduced that the

state may tax privileges, discriminate between relatives and grant exemptions, and is not precluded from this power by the provisions of the respective state constitutions requiring uniformity of taxation.

See also *Kochersperger v. Drake,* 167 Ills. 122; *Billings v. The People,* 189 Ills. 472, affirmed in 188 U. S. 97; Dos Passos on Inheritance Tax Law (2d ed.) § 8, *et seq.*

In Cooley on Taxation (5th ed.) at pages 8, 30, 584, that learned author says that succession to an inheritance may be taxed as a privilege, though the property of the estate itself be already taxed as property, and taxes are required to be uniform. It is an impost or duty upon the devolution of an estate. Other cases upholding, and some overthrowing, acts of this character will be found in the authorities already cited. To enumerate them here would unnecessarily burden the opinion.

In *Black v. State,* 89 N. W. 522, the supreme court of Wisconsin held invalid the inheritance tax law of that state upon the ground that it made unlawful discriminations between beneficiaries in the same class. We do not understand that such discriminations exist in our statute. Indeed, the Wisconsin court in referring to *Magoun v. Bank, supra,* in which the Illinois law, of which ours is a copy, was held valid, observed that the provisions of the Wisconsin law there held invalid were different from those in the Illinois law, which in the Magoun case were upheld. The exemption which the Wisconsin act contained was based upon the size of the whole property devised or granted, and not upon the amount received by each legatee or grantee, and the necessary result, as the opinion in that case states, was that people in the same class were subject to different rules, some being exempt while others are taxed. Were the foregoing the only objections made, we would proceed no

further, believing that they have been disposed of by the rulings of the supreme courts of Illinois and other states and by the supreme court of the United States under a statute the same as ours. But other objections, apparently not made in the cases arising under the Illinois law, are here presented and to them we now address ourselves.

2. It is contended that these provisions are violative of section 21 of article V of our constitution, which provides that "no bill except general appropriation bills shall be passed containing more than one subject, which shall be clearly expressed in its title," in that they embrace a subject distinct from, and not germane to, the subject mentioned in the title, and that their subject-matter is not clearly expressed therein. It is said that the legislation embraced in these sections changes and radically modifies two separate and distinct pre-existing laws of the state, one relating to the law of descent, the other to the transmission of property by testamentary conveyance, while all the other provisions of the act concern the taxation of property for the purpose of public revenue. It is further said that the power to make such changes in the substantive law of the state relating to the subject of descents and inheritances is referable to the police, and not to the taxing power of the state. The argument is that hitherto in this state under the general title of revenue only such legislation has been enacted in order to produce public funds as provides for the laying of direct taxes upon property, and that the word "revenue" in the title of this act is used in that sense. And the conclusion is that all such provisions in this act as are not related to the subject of direct taxation of property do not come within the title. It is conceded that the lexicographers give to "revenue" a broader meaning than that here contended for, but by reason

of the long continued custom in this state it is insisted that the restricted meaning must be here adopted.

Among other cases we are cited to *Geer v. Board of Com'rs,* 97 Fed. 435, wherein it is said that a bill for raising revenue within the meaning of section 31 of article V of the Colorado constitution which reads, "all bills for raising revenue shall originate in the house of representatives," is one which provides for the levy and collection of taxes, for the purpose of paying the officers and of defraying the expenses of the government, and that the bill then before the court was not of that character, for its main purpose was to authorize certain *quasi* municipal corporations to refund their debts.

That case is not in point here. The direct and avowed object of this act is to provide for securing public revenue for governmental purposes, and the word "revenue" in the title is sufficiently broad to include all provisions having that general object in view, not only provisions for securing revenue as the result of a direct tax upon property but revenue derived from the imposition of licenses, duties, excises, and a tax on occupations or on successions.

In *United States v. Norton,* 91 U. S. 566, it was said that federal "revenue laws" meant such laws as are made for the direct and avowed purpose of creating revenue or public funds for the service of the government. To the same effect is *United States v. Mayo,* 1 Gall. 396. In *State v. Ewing,* 22 Kan. 708-712, Mr. Justice Brewer, in response to the contention that only such funds as are raised by taxation of property can be included within an act whose title relates to revenue, said: "The word is broad and general, and includes all public moneys which the state collects and receives, from whatever source and in whatever manner. The general funds of this state are collected from taxes, but the legislature might,

in an act with such a title—at least so far as any question of the form of the legislation is concerned—enact that they be collected from licenses, or from the sale of lottery tickets, or it might unite and enact that part might be collected from one source and in one manner and the rest from another source and in a different manner."

If it be a fact that heretofore our general assembly has included in the general revenue laws only provisions for a direct tax on property, that is not conclusive that "revenue" was used in the restricted sense here. Until this act was passed it is well known that our legislative department had not selected as subjects of taxation privileges and occupations. And when it here created these new subjects it is clear that "revenue" was intended to include funds derived from a tax thereupon, and the terms was so used by the general assembly. We are clear that the title of this act, being one relating to revenue, clearly embraces provisions in the body of the act providing for public revenue from a tax on inheritances or successions. In *State v. Alston,* 94 Tenn. 674, it seems that certain provisions relating to an inheritance tax were included in the general revenue law of that state.

The further objection here urged that the title of the act is too general is not usually a tenable one. Indeed, this court in passing upon the titles of acts has advised the general assembly against the attempt to make them too specific. It is true that if the title is so general as to be misleading it may be obnoxious to the constitutional provision under consideration, and courts in some cases have declared titles so general as to be misleading, such, for example, as *Northwestern Mfg. Co. v. Chambers,* 58 Mich. 381, and *Stegmaier v. Jones,* 52 Atl. 56, but there is no such objection to the present title, in view of the financial

history of the state, of which the courts, as well as the people, are advised. One would naturally expect to find in an act entitled "revenue" provisions imposing a duty upon privileges or successions.

3.   The third general ground of objection is that this act, in so far as the sections under consideration are concerned, is repugnant to section 25 of article V, which reads: "The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say, * * * changing the law of descent." To this point is cited *In re Cope's Estate,* 191 Pa. St. 1. The direct inheritance tax law of Pennsylvania was there considered, and it was held to be a tax law, pure and simple, imposing a state tax upon specified personal property and exempting all others of the same class. Being a direct tax upon property and not laid upon the same with uniformity and equality, the court said that it was contrary to the constitutional provision of that state declaring that all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax. The court, moreover, went further and said that this provision of the constitution applied not only to all taxes upon every kind of property, but included inheritance or succession taxes as well. The act was also held invalid because it infringed another clause of the Pennsylvania constitution which declared that all laws exempting from taxation property other than the particular property therein described were void and the property exempted by the act under review did not come within such description. The court then, after having held the act unconstitutional because it was in violation of the exemption, uniformity and equality clauses of the state constitution, addressed itself to a further contention of the commonwealth that the thing imposed was not a tax at all, but rather an exercise

by the state legislature of its general police powers whereby it might appropriate to itself such portion of a decedent's estate as that body in its wisdom might consider necessary or proper, and to that end might change the pre-existing law of descent. To this the court replied that if the assumption be conceded, nevertheless the act was void, for on this assumption it was nothing more than a special act purporting to amend the law of descent, which the constitution of Pennsylvania, like ours, prohibits. This was the reasoning of the court:

"The pre-existing law of succession is changed by that act, in that it imposes a burden on so much of said property as is in excess of $5,000, and leaves it unchanged as to the residue. It is, therefore, a special, and not a general, act, because it does thus impose a burden on a part of said property, and declares that, in all estates, personal property, not exceeding $5,000 in value, shall be exempt from said burden. It thus changes the law of succession as to part of the property specified therein; * * * while others in precisely the same class are exempted therefrom."

The laying of a direct tax upon property just as much changes the law of the land under which the owner is entitled to its exclusive use and enjoyment as does the imposition of a succession tax upon the privilege of receiving property under the intestate laws change the law of descent. And yet we apprehend that a law of the former kind would not be called a local or special law; nor is it correct to say that it changes the law which protects the owner in the enjoyment of his property. It is difficult to see wherein the imposition of a succession tax on property passing under the intestate laws changes the pre-existing law of descent. That law remains just as it was before. Property passes thereunder, after

just as it did before the tax was laid, and to precisely the same persons, and the laying of the tax merely casts upon its devolution to those persons a burden that was not borne before, but which, at any time, the state could impose in the form of a tax.

But whether the reasoning of the court in Cope's case justifies the conclusion that the act is special and that it changes the law of descent is not important for us to determine, for it will be observed that the court expressly said that the act would be invalid, as contravening that provision of the constitution which forbids such legislation, provided it was not a tax law on property. If, on the other hand, the act merely imposed such a tax, as the court said it did, clearly it was not subject to the constitutional objection that it was a special law which changed the law of descent.

We have already held that our law imposes a tax upon the privilege of taking, receiving and enjoying property that passes by will or under our intestate laws, and that authority for its impositon is found in the sovereign power of the state to lay a tax upon privileges and successions. Cooley on Constitutional Limitations (5th ed.), 616. Therefore, both upon the authority of the Pennsylvania case and upon principle, our act does not infringe the section of our constitution prohibiting the changing of the law of descent by special act, and such is not its purpose. In legal contemplation it does not change the law of descent in the sense of the inhibition of our constitution, and, as already said, it no more modifies or abrogates the law of descent or the right to hold and enjoy property which passes by will than does any kind of a tax on property change the general law under which the owner enjoys it.

It may be, as counsel for plaintiff in error argues and as this court in 23 Colo. 492 remarked, that the

provisions we have been considering are most objectionable. Such observation of this court, however, had no reference to the question of their validity, but referred to their drastic nature and inequality or apparent lack of fairness in classificaton. So, also, it was made at a time when the bill containing them was under consideration by the general assembly, and therefore pertinent to the answer which the court was required to make to the question propounded by that body. But with the wisdom or policy of a completed work of the legislature merged into a statute, a court has nothing to do. However unwise the act may seem to the judiciary, if it is not inhibited by the fundamental state or federal law it cannot be annulled. Our investigation leads us to the conclusion that none of the constitutional objections urged are tenable. The judgment below, which was in harmony with this view, is affirmed.

*Affirmed.*