THE STATE ex rel. HOWARD A. GASS, State Superintendent of Public Schools, v. JOHN P. GORDON, State Auditor.

In Banc, December 22, 1915.

1. **REVENUE: Meaning of Word.** Unrestricted by the word "ordinary," the word "revenue" as used in the Appropriation Act of 1915, declaring that "there is hereby appropriated out of the State Revenue Fund, to be applied to the support of the public schools of the State, one-third of the ordinary revenue paid into the State Treasury for the fiscal years from July 1, 1914, to June 30, 1916," means "the annual and current income of the State, however derived, which is subject to appropriation for general uses." This definition excludes such income as the Constitution, or any permanent existing law, may specifically devote to a special purpose, in contradistinction to a general public use, or income which is not required to be paid into the State Revenue Fund, but into a special fund, among which are the collateral inheritance tax, the money derived from license fees on motor vehicles, fees paid into the State Treasury to the credit of the Insurance Department Fund, and other funds of a similar sort.

2. ————: ————: **As Used in Constitution.** The words "State revenue" used in · section 7 of article 11 of the Constitution, requiring at least "twenty-five per cent of the State revenue, exclusive of the interest and sinking fund, to be applied annually to the support of the public schools," refer back to the words "ordinary revenue of the State," used in section 6 of said article, for their definition; but neither expression affords a clear-cut guide as to what income of the State is included.

3. ————: **Means Ordinary Revenue.** The word "revenue" as used in the Constitution and in the Appropriation Act of 1915 is limited by the word "ordinary," for both instruments use the words "ordinary revenue" in referring to the appropriations for the support of the public schools; and every appropriation act since 1877, except that of 1895, has used either the words "ordinary State revenue" or "ordinary revenue;" and so historically and lexically the word "revenue" when used in. connection with an appropriation for the support of public schools means "ordinary revenue"—that is, revenue or income arising from usual methods of taxation.

4. **ORDINARY REVENUE: Meaning.** The words "ordinary revenue," as used in section 6 of article 11 of the Constitution and in section 1 of the Appropriation Act of 1915, Laws 1915, p. 89, mean "the regular and usual annual income of the State, however derived, which is subject to appropriation for general public uses."

5. ————: **Administrative Interpretation and Practice.** The interpretation put upon the words "ordinary revenue" used in the Constitution and appropriation acts, for a long series of years, by the executive officers of the State upon whom the duty of interpretation is cast, and long acquiesced in by the Legislature, is, in the absence of other qualifying considerations, decisive; but where new sources of income have recently been provided by law, and there has been no uniformity of interpretation by such officers, the rule is of no aid.

6. ————: **Share of Public Schools: Taxes.** Under the Appropriation Act of 1915, appropriating "one-third of the ordinary revenue paid into the State Treasury" to the support of the public schools, one-third of all moneys received as taxes on real or personal property from county collectors, and one-third of the county foreign insurance tax, the private car tax and the express companies' tax, was properly applied to that purpose.

7. ————: ————: **Things Not Included.** But receipts from old bond and coupon accounts, from amounts refunded, from insurance on Federal Soldiers' Home, from sale of old furniture, from itinerant vendors' licenses, and from Fish Commissioner's

fund, are not ordinary revenue, and one-third thereof cannot be so applied.

8. ———: ———: **Warehouse and Grain Department Fees.** Only one-third of the net revenue left, after paying all operating expenses, of the money or fees collected by the Warehouse and Grain Department for the inspection of hay and grain, are appropriated by the words "ordinary revenue" to the public schools, since the department was not intended to be an earner of profits, but only to pay its own way.

9. ———: ———: **State as Trustee: General Rule as to Earnings.** The general rule should be that whenever a statute creating a department of government of this State provides, or whenever an appropriation act for the support of such a department contains a proviso, that the cost of maintaining and operating it shall be defrayed wholly from fees earned by it, and not otherwise, the State is, as to an amount equal to the cost of upkeep, a trustee merely of the moneys paid into the State Treasury, and its general revenue fund is entitled only to the surplus after deducting the operating expenses. As to all such departments the term "revenue" means net revenue.

10. ———: ———: ———: **Compensation Not Dependent Upon Earnings.** But when the payment of operating expenses of any department of the State government is not dependent upon its earnings, and the earnings are required by express statute to go directly into the State Treasury, the gross sum of its earnings is to be considered as ordinary revenue. The earnings of the Public Service Commission, State Auditor and Secretary of State are ordinary revenue, since the statutes provide for the payment of the expenses of all those departments whether they earn fees or not, and that the fees earned by them are to be paid into the State Treasury.

11. ———: ———: **Interest.** Interest accruing to the State from moneys deposited in banks or other depositaries is to be considered "ordinary revenue," unless it arises from a special fund and by express statutory provision the interest is to be expended for the identical purpose for which the special fund from which it accrues is to be spent.

12. ———: ———: **Fines: Not Ordinary Revenue.** Fines paid into the State Treasury in pursuance to a judgment of the Supreme Court finding certain corporations guilty of a violation of the anti-trust laws, are revenue, but not "ordinary revenue," and the State Auditor is not required by an appropriation of one-third of the "ordinary revenue" to the support of the public schools, to apply them to that purpose.

13. ———: ———: **Insurance Department Fund.** Neither are the moneys which for some years have been intermittently

transferred from the "Insurance Department Fund" to the General Revenue Fund ordinary revenue, and no part of them is to be applied to the public schools. They are not annual or current revenue, are required to be paid into a special fund, and only the overflow reaches the State Revenue Fund, and then only in pursuance to an express and special act, passed, ordinarily, biennially.

14. ———: ———: **Factory Inspection Fund.** Neither the gross nor the net income from the Factory Inspection Fund is a part of the "ordinary revenue" appropriated to the support of the public schools, for the reasons: First, such income, or fees, go into a special fund, and the net amount is not paid into the General Revenue Fund in regular and annual payments, but biennially only; and, second, the fund is primarily devoted to the payment of the expenses of the department, and no excess of expenses over income can be made up from general revenue.

15. ———: ———: **Examiners Appointed by State Auditor.** Only the net earnings of the examiners appointed by the State Auditor to examine and audit the books of the several counties and divers State institutions, should be counted as "ordinary revenue," since the statute seems to contemplate that only the excess of their earnings, after their salaries are paid, is to pass to the State Revenue Fund.

16. ———: ———: **Other Sources of Income.** Having adopted as a guide the rule that "ordinary revenue" within the purview of the Appropriations Act of 1915 declaring that "one-third of the ordinary revenue paid into the State Treasury" during the biennial period are appropriated to the support of the public schools, means "regular and usual annual income of the State which is subject to appropriation for general public purposes," it is *held* that the entire income from certain specific sources enumerated is embraced within the act (whether arising from taxation or gross earnings); that the net (but not the gross) earnings of other departments enumerated are also included; and that certain other sources of income, which comes into the State Treasury biennially, or intermittently, also enumerated, are excluded.

## Mandamus.

For judgment see opinion, page 422.

*A. T. Dumm* for relator.

(1) The terms "ordinary revenue," as used in section 6 of article 11 of the Constitution of 1875 and in the Appropriation Act of 1915 (Laws 1915, p. 89),

State ex rel. v. Gordon.

and "State revenue," as used in section 7 of article 11 of the Constitution, are synonymous, and include all receipts into the State Treasury to the credit of the revenue fund. Secs. 6 and 7, art. 11, Constitution 1875; Laws 1915, p. 89; Laws 1895, p. 18; 34 Cyc. 1691; United States v. Bromley, 12 How. (U. S.) 97; Bates v. Porter, 74 Cal. 224; People ex rel. v. Supervisors, 4 Hill (N. Y.), 23; People v. Railroad, 34 Barb. (N. Y.) 134; Iverson Brown's Case, 91 Va. 779; State ex rel. v. School Fund, 4 Kan. 268; Commonwealth v. Bailey, 3 Ky. L. R. 117; Brown v. Elder, 32 Colo. 535; United States v. Mayo, 1 Gall. 396; State v. Ewing, 22 Kan. 708; Donelson v. State, 3 Lea (Tenn.), 695; Yancey v. Mfg. Co., 33 Ga. 624; Lamar W. & E. L. Co. v. Lamar, 128 Mo. 202. (2) Section 7 of article 11 of the Constitution of 1875 is a mandate to the Legislature to appropriate not less than twenty-five per cent of the State revenue, exclusive of the interest and sinking fund, to be applied annually to the support of the public schools. And the exclusion of the "interest and sinking fund" is the inclusion of all other receipts into the treasury to the credit of the revenue fund.

*Robert Burkham*, Attorney for the Board of Education of the City of St. Louis; *Gage, Ladd & Small*, Attorneys for the School District of Kansas City; *H. K. White*, Attorney for the School District of the City of St. Joseph; *Ed. D. Merritt*, Attorney for the School District of Springfield; *Kelsey & Cameron*, Attorneys for the School District of Joplin; *Mahan, Smith & Mahan*, Attorneys for the School District of Hannibal; *Charles E. Yeater*, Attorney for the School District of Sedalia; *A. G. Young*, Attorney for the School District of Webb City; and *Arthur B. Chamier*, Attorney for the School District of Moberly, *Amici Curiae*.

(1) The expression "ordinary revenue" employed in the Act of 1915 is necessarily equivalent to

the expression "State revenue" as used in article 11, section 7, of the Constitution. (2) "State revenue" includes inspection fees and the like whether this expression be considered, 1st, independently: State ex rel. v. Ewing, 22 Kan. 708; United States v. Bromley, 12 How. (U. S.) 88; Van Sant v. Stage Co., 59 Md. 330; Power & Conduit Co. v. Buffalo, 131 App. Div. (N. Y.) 485; or, 2nd, in connection with the context: Art. 11, secs. 6, 8, Constitution.

FARIS, J.—This is an original proceeding by mandamus, brought by relator as State Superintendent of Public Schools, to compel respondent, as State Auditor, to set apart and certify for payment to the relator for the use of the public schools of the State, the sum of $496,587.34, under the Act of February 12, 1915 (Laws 1915, p. 89), which required the State Auditor to ascertain and set apart one-third of the ordinary revenue for the support of the public schools.

The case is here upon the pleadings and an agreed statement of facts. The pleadings are conventional, and since no point is made touching them, we need not cumber the books with them. The agreed statement of facts, which we apprehend will be found sufficient to convey an understanding of the conditions and issues, runs thus:

"It is agreed that during the fiscal year ending June 30, 1915, there were paid into the State Treasury to the credit of the General Revenue Fund, the following sums from the different sources mentioned:

1. From county collectors (tax on real and personal property) ................................$3,851,174 61
2. County foreign insurance tax................. 365,449 17
3. Private car tax ............................. 9,870 90
4. Express companies' tax ..................... 44,737 68
5. Notaries' commissions ..................... 12,336 00
6. Land Department fees ..................... 556 22
7. Fees earned in office of State Auditor........ 8,380 88
8. Fees earned by office of Secretary of State.... 9,719 30

| | | |
|---|---|---:|
| 9. | Incorporation tax (fees paid by corporations upon their incorporation and upon their increase of capital stock) | 87,017 50 |
| 10. | Fees from Excise Commissioner of city of St. Louis | 42,462 00 |
| 11. | Proceeds of sale of beer stamps | 460,858 27 |
| 12. | Interest received from State depositaries | 147,223 35 |
| 13. | Sale of oil stamps (being fees from oil inspections) | 150,466 80 |
| 14. | Interest on deposit of fees by St. Louis Excise Commissioner | 47 17 |
| 15. | Interest on deposit of Fish Commission | 18 74 |
| 16. | Excess fees from clerk of Supreme Court, clerk of St. Louis Court of Appeals, clerk of Springfield Court of Appeals, clerk of Kansas City Court of Appeals | 3,573 62 |
| 17. | Fees collected by Excise Commissioners of St. Louis county | 3,713 02 |
| 18. | Receipts from sale of laws | 2,018 50 |
| 19. | Receipts from old bond and coupon account | 15,270 43 |
| 20. | Receipts from amounts refunded | 36,032 06 |
| 21. | Receipts from fines assessed against lumber companies for violation of Anti-Trust Act | 252,728 65 |
| 22. | Receipts from fees of Poultry Experiment Station | 5,280 96 |
| 23. | Receipts from fees of Warehouse and Grain Department | 127,123 37 |
| 24. | Moneys earned by State Auditors' Examiners | 6,702 08 |
| 25. | Receipts from insurance on Federal Soldiers' Home | 2,308 92 |
| 26. | Receipts from sale of old furniture | 165 00 |
| 27. | Receipts for Itinerant Vendors Licenses | 25 00 |
| 28. | Receipts from fees of Bureau of Labor | 2 07 |
| 29. | Receipts from fees of Board of Agriculture | 25 00 |
| 30. | Receipts from fees of Fruit Experiment Station | 299 72 |
| 31. | Receipts from Fish Commissioner's refund | 301 05 |
| 32. | Transferred from Insurance Department Fund | 125,000 00 |
| 33. | Transferred from Factory Inspection Fund | 6,271 93 |
| 34. | Transferred from Text-Book Fund | 990 00 |
| 35. | Receipts from fees of Public Service Commission | 36,946 87 |

"The aggregate of the items enumerated above, numbered 1, 2, 3 and 4, is $4,271,232.36. The respondent, State Auditor, did on July 3, 1915, set apart and certify to the relator one-third of said sums, 'that is to say, $1,423,744.12, as the total amount to be ap-

portioned by relator for the benefit of the public schools of the State.

"The respondent, as State Auditor, and his predecessors in said office, have continuously annually for many years prior to the present year, set apart and certified to the relator and the predecessors of the relator in the office of State Superintendent of Public Schools, in addition to one-third of the moneys derived from the first four sources above mentioned, one-third also of the moneys derived from the following sources, to-wit:

5. Notaries commissions.
6. Land Department fees.
7. Fees earned in office of State Auditor.
8. Fees earned by office of Secretary of State.
9. Incorporation tax.
10. Fees from Excise Commissioner of city of St. Louis.
11. Proceeds of sale of beer stamps.
12. Interest received from State depositaries.
13. Sale of oil stamps.
14. Interest on deposit of fees by St. Louis Excise Commissioner.
15. Interest on deposit of Fish Commission.
16. Excess fees from clerk of Supreme Court, clerk of St. Louis Court of Appeals, clerk of Springfield Court of Appeals, clerk of Kansas City Court of Appeals.
17. Fees collected by Excise Commissioners of St. Louis county.

"That the moneys derived from said sources, numbered 5 to 17, both inclusive, and paid into the State Treasury to the credit of the General Revenue Fund during the year ending June 30, 1915, amounted in the aggregate to $926,372.87, no portion of which has been set apart and certified by respondent as State Auditor to the relator, for the year ending June 30, 1915.

"Neither the respondent, as State Auditor, nor any of his predecessors in said office, have heretofore set apart or certified to the relator or his predecessors in the office of Superintendent of Public Schools, any portion of the moneys derived and paid into the State Treasury to the credit of the General Revenue Fund from the following sources:

266Mo.26

State ex rel. v. Gordon.

18. Receipts from sale of laws.
19. Receipts from old bond and coupon account.
20. Receipts from amounts refunded.
21. Receipts from fines assessed against lumber companies for violations of Anti-Trust Act.
22. Receipts from fees of Poultry Experiment Station.
23. Receipts from fees of Warehouse and Grain Department.
24. Moneys earned by State Auditors' Examiners.
25. Receipts from insurance on Federal Soldiers' Home.
26. Receipts from sale of old furniture.
27. Receipts from Itinerant Vendors' Licenses.
28. Receipts from fees of Bureau of Labor.
29. Receipts from fees of Board of Agriculture.
30. Receipts from fees of Fruit Experiment Station.
31. Receipts from Fish Commissioner's refund.
32. Transferred from Insurance Department Fund.
33. Transferred from Factory Inspection Fund.
34. Transferred from Text-Book Fund.
35. Receipts from fees of Public Service Commission.

"Some of the laws from which these moneys were derived and paid into the State Treasury are of comparatively recent enactment, as will be pointed out in the briefs to be filed.

"The relator here expressly waives and abandons any claim to a setting apart or a certificate to him by respondent of any part of the moneys derived from the sources now to be mentioned and already referred to in this statement by numbers, as follows:

19. Receipts from old bond and coupon account.
20. Receipts from amounts refunded.
25. Receipts from insurance on Federal Soldiers' Home.
26. Receipts from sale of old furniture.
27. Receipts from Itinerant Vendors' Licenses.
31. Receipts from Fish Commissioner's refund.

And it is agreed that the relator's petition be taken and regarded as amended by striking out any claim to a setting apart of moneys derived from any of the sources last mentioned.

"After excluding from consideration the moneys derived from the six sources last mentioned (claim to which is now abandoned), the moneys derived from the other sources mentioned (no part of which has ever

been set apart and certified by State Auditors for the benefit of the public schools), and paid into the State Treasury to the credit of the General Revenue Fund, amount to the sum of $563,389.15.

"The moneys paid out for salaries and expenses of the Warehouse and Grain Department during the period mentioned, were $96,491.42. The receipts of said department were $127,123.37.

"The sum paid out of the State Treasury for the support (salaries and expenses) of the Public Service Commission during the year mentioned were largely in excess of the fees paid into the State Treasury and earned by said commission.

"The same is true as to the proceeds of the sale of laws; the expense of publishing the laws being greater than the amount received from the sale.

"The expense of maintaining the Poultry Experiment Station, which is paid out of the State Treasury, is largely in excess of the fees received on that account.

"The same is true of salaries and expenses connected with the Department of Labor; the Board of Agriculture and the Fruit Experiment Station; in each case the expense of maintaining each one of these departments, which is paid out of the State Treasury, is in excess of the fees received from them respectively.

"The amount of the salaries, wages and expenses of the State Auditors' Examiners, which were paid by the State, was substantially the same as the moneys paid into the State Treasury on account of the services of said examiners.

"The one hundred and twenty-five thousand dollar ($125,000) item, numbered 32 in this statement, 'Transferred from Insurance Department Fund,' was so transferred by virtue of section 55a, an act with the heading: 'Appropriations; contingent and inci-

dental expenses for the years 1915 and 1916,' approved April 2, 1915, Laws 1915, p. 20.

"The Attorney-General wrote to the respondent, the State Auditor, the opinions set out in the return of the respondent.

"It is agreed that, prior to the filing of the petition for an alternative writ of mandamus, demand was made by relator upon respondent for the relief herein sought, and the same was refused; and that the petition shall be considered and taken as amended so as to show such demand and refusal.

"In the cases in which the figures shown in the petition as to the amount of moneys received from any source do not correspond with the figures contained in this agreed statement of facts, the petition is to be considered as amended to correspond to the agreed statement of facts.

"If the court shall be of the opinion that as to moneys derived from some of the sources mentioned in the relator's petition and claimed by him therein (and not herein waived and abandoned by him), the relator's claim as made in his petition to a setting apart and certification to him of a part thereof cannot be maintained, and shall be of the opinion that as to some of said moneys no part thereof should be set apart or certified by respondent to relator, it is agreed that as to such moneys and the claim thereof the petition of the relator shall be taken and considered as amended by striking out all claim on account of any said moneys, and the relator hereby asks that his petition be considered and regarded as amended in that respect; so that if the court shall be of the opinion that the relator is entitled to any part of the relief which he asks, he shall not be denied all relief for the reason that he has asked for more than he is entitled to.''

## OPINION

I. While we have not had the benefit of respond-ent's views, since regrettably and to the great increase
of our labors, he has not seen fit to fur-nish us with a brief it is apodeictic that the controversy turns upon the construction to be placed upon section 1 of the Act of February 12, 1915, appropriating money out of the State Revenue Fund for the support of the public schools. [Laws 1915, sec. 1, p. 89.]   This section reads thus:

Meaning of Word "Revenue."

"There is hereby appropriated out of the State Revenue Fund, to be applied to the support of the public schools of the State, one-third of the ordinary revenue paid into the State Treasury for the fiscal years from July 1, 1914, to June 30, 1916, which amount of said fiscal year apportionment shall be ascertained and set apart to said school moneys by the State Auditor, as is or may hereafter be provided by law."

It is likewise apparent that the controversy in its last analysis resolves itself into the single question: What is the meaning of the two words "ordinary revenue," as these words are used in the Legislative act, supra?

It is fairly clear, we think, that the word "revenue" is modified or limited by the use of the word "ordinary."   The effect of this limitation we will discuss hereafter.   Turning to the lexicons of the language we find that the word "revenue" means: "The annual yield of taxes, excise, customs, duties, rents, etc., which a Nation, State, or municipality collects and receives into the treasury for public use." [Webster's Int. Dict.]   "The total current income of a government, *however derived,* subject to appropriation for public uses." [Standard Dict.]   "The annual income of a State derived from the taxation, customs, excise, *or other sources and appropriated to the payment of the national expenses.*" [Century Dict.]

These definitions have met the approval of the courts, as will be noted by an examination of the below cases: Fletcher v. Oliver, 25 Ark. 289; Bates v. Porter, 74 Cal. 224; United States v. Norton, 91 U. S. 566; State v. School Fund Commrs., 4 Kan. 261; Vansant v. Harlem Stage Co., 59 Md. 330; State ex rel. v. Ewing, 22 Kan. 708; United States v. Bromley, 53 U. S. 88; People's U. S. Bank v. Goodwin, 162 Fed. 937; In re Magnes Est., 32 Colo. 527.

In the case of State ex rel. v. Ewing, supra, at page 712, the Supreme Court of Kansas, in an opinion by Judge BREWER, sometime judge of the Supreme Court of the United States, said:

"The Act of 1879 is entitled, 'An act to provide revenue,' etc. Now how broad is the term 'revenue,' and what may be included in such a title? Does it mean simply funds raised by taxation, and is the levying of taxes all that may be included? Such would seem to be the views of the counsel for the State, but we cannot think them correct. One of the definitions given by Webster of the term is, 'the annual produce of taxes, excise, customs, duties, rents, etc., which a Nation or State collects and receives into the treasury for public use.' The word is broad and general, and includes all public moneys which the State collects and receives, from whatever source and in whatever manner. The general funds of this State are collected from taxes, but the Legislature might, in an act with such a title—at least, so far as any question of the form of the legislation is concerned—enact that they be collected from licenses, or from the sale of lottery tickets, or it might unite and enact that part might be collected from one source and in one manner, and the rest from another source and in a different manner."

In the case of United States v. Bromley, supra, at page 96, the Supreme Court of the United States said:

"That the act which prescribes the offense charged is a revenue law, there would seem to be no doubt. In its title, it is declared to be an act to reduce the rates of postage, and for the 'prevention of frauds on the revenue of the Post-Office Department.' In its character and object it is a revenue law, as it acts upon the rates of postage and increases the revenue by prohibiting and punishing fraudulent acts which lessen it. Under the Act of 1836, the revenue of the Post-Office Department is paid into the Treasury. Revenue is the income of a State, and the revenue of the Post-Office Department, being raised by a tax on mailable matter conveyed in the mail, and which is disbursed in the public service, is as much a part of the income of the government as moneys collected for duties on imports."

The various definitions of this word as collated and summarized by Cyc. are as follows:

"The annual product of taxes, excise customs, duties, rents, etc., which a Nation or State collects and receives into the Treasury for public use; the yearly income of a government or a person natural or artificial, from the property belonging to such government or person; the income of the State; the income which a State collects and receives into its Treasury and has appropriated for the payment of its expenses; the product or fruit of taxation; the income of the government arising from taxation, duties and the like; the annual profits of taxes, excise, customs duties, rents, etc., which a Nation or State collects and receives into the Treasury for public use; the income of the State or Nation derived from the duties and taxes and other sources for the payment of the national expenses." [34 Cyc. 1691.]

Clearly the word "revenue" is broader than and includes taxation, as well as all other sources of municipal income. Revenue may be said to be the genus, while taxation is but a species. We are convinced

therefore that the word "revenue," as used in the appropriation act under discussion, when standing alone, and when not modified by the word "ordinary" (which we shall later discuss, when we come to sum up our conclusions), means: *The annual and current income of the State, however derived, which is subject to appropriation for general public uses.* This excludes such income as the Constitution, or any permanent existing law, may specifically devote to a special purpose, in contradistinction to a general *public* use, or which is not required to be paid into the State Revenue Fund, but into a special fund, e. g., the collateral inheritance tax, specifically collected for the support of the State University and its departments (Sec. 312, R. S. 1909); the money derived from license fees on motor vehicles (Laws 1911, p. 331, sec. 13); fees paid into the State Treasury to the credit of the "Insurance Department Fund" (Sec. 6884, R. S. 1909); and others of similar sort. Color is lent to this view not alone by the lexical meaning of the word revenue and by its construction by respectable and high courts, but by the very language of our Constitution, which enjoins upon the Legislature the making of this appropriation for the support of the public schools, and which reads thus:

"In case the public school fund now provided and set apart by law, for the support of free public schools, shall be insufficient to sustain a free school at least four months in every year in each school district in this State, the General Assembly may provide for such deficiency in accordance with section eleven of the article on revenue and taxation; but in no case shall there be set apart less than twenty-five per cent *of the State revenue, exclusive of the interest and sinking fund,* to be applied annually to the support of the public schools."

Further light is cast upon this view by the provisions of section 6 of article 11 of the Constitution,

which, after naming divers sources from which funds for the support of the public schools of the State should be derived, couples itself by language *in pari materia* with section 7, supra, by providing, among other things, that certain named funds from the several sources in the section designated, *"together with so much of the ordinary revenue of the State as may be by law set apart for that purpose,* shall be faithfully appropriated for establishing and maintaining the free public schools,"* etc. [Italics ours.] Confessedly, however, when we concede that the expressions used are *in pari materia* and therefore in a way synonymous, we are met by the doubt whether they each mean "State revenue," or each mean "ordinary revenue of the State." The latter expression is first used in the article; the former merely refers back to the latter, logically we may say, for the definition of the words "State revenue" as latterly used. So, no comfortable short-cut can with logical consistency, be found in the Constitution. For the Legislature, in nineteen appropriation acts, out of a total of twenty, has used the words "ordinary State revenue," or "ordinary revenue," as used in said section 6, instead of the language in section 7 of the Constitution; notwithstanding the last-named section is the one which specifically enjoins upon the Legislature the duty of appropriating as much as one-fourth of the State revenue for the support of the public schools.

II. From 1877, when for the first time it became the Legislature's Constitution-enjoined duty to appropriate "at least twenty-five per cent of the State revenue, exclusive of the interest and sinking fund," to the support of the public schools, till 1887, the Legislature of this State biennially set apart *"one-fourth of the ordinary State revenue paid into the treasury"* for the support of the public schools; using in making such appropri-

**Language of Prior Acts.**

ation the language we italicise above.   [Laws 1877, p. 12; Laws 1879, p. 3; Laws 1881, p. 3; Laws 1883, p. 4; Laws 1885, p. 4.]   In 1887 ''one-third of the ordinary State revenue'' was for the first time appropriated for the support of the public schools of this State. Biennially since, one-third, instead of one-fourth, of the ordinary revenue has been by the Legislatures of this State so set apart.   Likewise in the years 1887, 1889 and 1891, the language of the Appropriation Act was ''ordinary State revenue.''   [Laws 1887, p. 4; Laws 1889, p. 12; Laws 1891, p. 24.]   For the first time in 1893, and ever since, *barring one exception, that of the Act of 1895,* below discussed, the words used in making this appropriation have been simply ''ordinary revenue.''   [Laws 1893, p. 19; Laws 1897, p. 21; Laws 1899, p. 24; Laws 1901, p. 19; Laws 1903, p. 22; Laws 1905, p. 26; Laws 1907, p. 38; Laws 1909, p. 50; Laws 1911, p. 72; Laws 1913, p. 82; Laws 1915, p. 89, already set out *verbatim,* supra.]   In 1895 the Legislature in making this appropriation used the words *''one-third of all moneys* paid into the State Treasury for the years 1895 and 1896 to the *credit of the State Revenue Fund.''*   [Laws 1895, p. 18.]   It is urged that the expression used, to-wit, ''one-third of all the moneys paid  .  .  .  to the credit of the State Revenue Fund,'' is highly significant.   We do not so regard it.   For the ''one-third of all the moneys'' is limited by the requirement that such moneys shall be from the ''State revenue;'' and the question here largely vexing us is, What moneys of the State are included in the expression ''State revenue,'' and what is meant thereby?   We would grant the contention if the language of the act had been simply ''one-third of all the moneys paid into the State Treasury,'' and had, as it did not, stopped there.   But this is not important.   At most it is but a straw in the wind, only infinitesimally meet in determining direction.

III. We conclude then that both lexically and historically the definition given above of the word "revenue" as used in the statute under discussion, is reasonably correct. But as this word appears both in the appropriation act here confronting us and in the Constitution (Sec. 6, art. 11, Constitution 1875), it is clearly limited by the word "ordinary." We are not warranted in casting this word out, but must use it and give a meaning to it, if to do so will not defeat the legislative intent, or render the statute and organic law absurd or meaningless. [Strottman v. Railroad, 211 Mo. 227; State ex rel. v. Harter, 188 Mo. 516.]·

Revenue and Ordinary Revenue.

As words when used by the people in their Constitution, and by the Legislatures in their statutes, are ordinarily to be construed to be used in their ordinary sense (Sec. 8057, R. S. 1909), again recourse must be had to the dictionaries. From these we find the word "ordinary" means in its adjectival use as it occurs in the act before us: "*According to established order; settled, regular.*" It is a synonym of "normal, common, customary, usual." Its antonyms are: "Extraordinary, unusual, uncommon." Taking the two words together, then, as they occur both in our Constitution and in the appropriation act before us, and being guided by both their lexical and legal meanings, as well as the construction urged on us by the necessity for formulating a fixed and general rule, we conclude that the words "ordinary revenue," as used in said section 6, article 11, of the Constitution and in the act under discussion (Sec. 1, p. 89, Laws 1915), mean: *The regular and usual annual income of the State, however derived, which is subject to appropriation for general public uses.*

IV. Keeping this construction of the meaning of "ordinary revenue" before us, there is no mountain-

ous difficulty in deciding the concrete facts here vexing us. The controversy for the most part, we think, becomes fairly plain. The trouble lies in steering a legal, logical and sensible course through the bewildering maze of diverse statutes which created departments of the State government, the operating of some of which is carried on at a total or partial loss and others of which produce either gross or net incomes to the State, and of formulating a fixed rule of construction, applicable to all these diverse conditions, which will serve to obviate the thick and excusable uncertainty heretofore and now prevailing.

If we should grant that *as a matter of law*, the words "ordinary revenue" are ambiguous—a thing we cannot bring ourselves to concede—we could, if the above conditions presented all of the facts and showed all of the difficulties, very readily (if there were not other and additional items in dispute) and speedily settle this case by invoking the well-recognized rule of statutory construction, that the meaning put upon the words of these many similar appropriation acts by the executive officers of the State upon whom the duty of interpretation falls, is of great weight, and absent other qualifying considerations, decisive (Schawacker v. McLaughlin, 139 Mo. 333; Darling v. Potts, 118 Mo. 506; Ross v. Railroad, 111 Mo. 18; Barber Asphalt Paving Co. v. Meservey, 103 Mo. App. 186); especially when coupled with the passive acquiescence of the Legislature for almost forty years. But other items, to-wit, those numbered 18, 21, 22, 23, 24, 28, 29, 30, 32, 33, 34 and 35, are likewise in dispute here. As to these items we gather from the record and judicially notice from the public biennial reports of the State Auditor there has been no uniform practice in the office of the State Auditor. Some years some of these items last above were included, and in other years they, or some of them formerly taken into account, were omitted, and others of them used. So great was

the doubt and uncertainty in this behalf existing that it caused the discrepancy to be pointed out by a special legislative committee having in charge the examination of the various State offices.

In the light of this latter condition we cannot say that executive interpretation, long acquiesced in by the Legislature, aids us; for the very simple reason that *there has been no uniformity in interpretation by such executive officers,* and conduct seeming to be legislative acquiescence is found to be passive non-interference with changing methods wholly lacking uniformity. It is plain then that we are not aided and cannot be aided by invoking any rule of construction made for us by executive interpretation through a long course of years.

V. It appears from the record that moneys accruing from items numbered 1, 2, 3 and 4, to-wit:

1. From county collectors (tax on real and personal property);
2. County foreign insurance tax;
3. Private car tax;
4. Express companies' tax;

aggregating $4,271,232.36, are not in dispute; that in pursuance of a uniform custom, the respondent, as both he and his predecessors in office have always done, set apart and certified on July 3, 1915, for the use of the public schools, the sum of $1,423,744.12. So with these items, since there is no dispute here about them or about this sum, and since we think the course taken as to them is undoubtedly correct, we need not concern ourselves further.

Taxes.

Items numbered 19, 20, 25, 26, 27 and 31, to-wit:

19. Receipts from old bond and coupon account;
20. Receipts from amounts refunded;
25. Receipts from insurance on Federal Soldiers' Home;
26. Receipts from sale of old furniture;
27. Receipts from itinerant vendors' licenses;
31. Receipts from Fish Commissioner's Refund;

are abandoned by relator.    He concedes that the public schools are not, under the terms of the act under discussion, entitled to one-third of any of the items last above.    Therefore we dismiss them from our discussion.

Items numbered 5 to 17, both inclusive, to-wit:

5. Notaries' commissions.
6. Land Department fees.
7. Fees earned in office of State Auditor.
8. Fees earned by office of Secretary of State.
9. Incorporation tax.
10. Fees from Excise Commissioner of city of St. Louis.
11. Proceeds of sale of beer stamps.
12. Interest received from State depositaries.
13. Sale of oil stamps.
14. Interest on deposit of fees by St. Louis Excise Commissioner.
15. Interest on deposit of Fish Commission.
16. Excess fees from clerk of Supreme Court, clerk of St. Louis Court of Appeals, clerk of Springfield Court of Appeals, clerk of Kansas City Court of Appeals.
17. Fees collected by Excise Commissioners of St. Louis county.

are, however, in dispute here.    The agreed case as to them shows that both respondent and his predecessors in the office of State Auditor have for many years uniformly, until this year, set apart one-third of all State income arising from each of the last above several items, under authority conferred by appropriation acts couched in precisely similar verbiage to that here under discussion.

Items numbered 18, 21, 22, 23, 24, 28, 29, 30, 32, 33, 34 and 35, to-wit:

18. Receipts from sale of laws.
21. Receipts from fines assessed against lumber companies for violations of Anti-Trust Act.
22. Receipts from fees of Poultry Experiment Station.
23. Receipts from fees of Warehouse and Grain Department.
24. Moneys earned by State Auditors' Examiners.
28. Receipts from fees of Bureau of Labor.
29. Receipts from fees of Board of Agriculture.
30. Receipts from fees of Fruit Experiment Station.
32. Transferred from Insurance Department fund.
33. Transferred from Factory Inspection fund.
34. Transferred from Text-Book Fund.
35. Receipts from fees of Public Service Commission.

are likewise in dispute. None of said items last above
has been uniformly taken into account in setting apart
moneys from general revenue for the support of public
schools by either respondent or any of his predeces-
sors. Thus stands the controversy, and so we come
to consider specific matters and funds in dispute.

VI. The question whether "ordinary revenue"
includes the whole of the $127,123.37 of gross earnings
of the office of Warehouse Commissioners,
Warehouse   or whether it includes only the net earn-
Department. ings (the sum of $30,631.95) of such of-
fice after deducting aggregate sums paid out of the
State Treasury for salaries and contingent expenses
for upkeep, presents much difficulty. No consistent
course has been pursued by the Legislature in deal-
ing with this department. This makes it well nigh im-
possible for us to deduce a consistent rule touching
the fees of this department. In 1913 the whole of
article 2 of chapter 60, Revised Statutes 1909, which
provided theretofore for the inspection of hay and
grain, was repealed and a new act *in toto* was passed
(Laws 1913, pp. 354-373), which of course, is now the
law. That this department was not intended to be
an earner of profits, but merely to pay its own way,
appears conclusively from the terms of the act itself,
which provides that the charges fixed by the Ware-
house Commissioner for services rendered "shall be
regulated in such manner as will, in the judgment of
the commissioner, produce sufficient revenue to meet
the necessary expenses of the service of inspection and
no more." [Sec. 41, p. 367, Laws 1913.] This view
is accentuated by the language of the section of the
act appropriating money for the support of this de-
partment for the years 1913 and 1914 (the earning
for six months of which latter year are here in con-
troversy). After setting out the amounts appropriated,
it is further provided in the act "that no more [mon-

ey] shall be drawn against the appropriation than has been paid into the treasury by said department, the intention being that the above-named department shall support itself out of its fees made and turned into the treasury.'' [Laws 1913, p. 9, sec. 12b.] While there is no such condition specifically attached to the appropriation for this department for the years 1915 and 1916, so far as we have been able to find, yet the condition set out in the Act of 1913, in intent, only follows the terms of the act creating the department. [Sec. 41, Laws 1913, p. 367, supra.] Therefore, while conceding that by reason of the inconsistence of treatment of this department by the Legislature, we are unable to bring it strictly within the definition we formulate, we conclude that only the net sum, after deducting operating expenses, should be here taken into account. So much only can we gather of the intent of the Legislature from its acts. If the intent be otherwise, the language next used by the Legislature can clarify the point beyond dispute. Indeed, here for a period of six months, the case falls exactly within our rule. We are unable from the facts before us to segregate the earnings of this period from those of the other six months in controversy. For these reasons we take into account from this item, the sum of $30,631.95 only, same being net revenue left after the payment of all operating expenses.

The general rule by which departments like the above are to be measured, would seem to be that: Whenever a statute creating a department of government of this State provides (or whenever an appropriation for the support of a department of government contains such a proviso) that the cost of operation shall be defrayed wholly from fees earned by such department and not otherwise, then clearly the State is, as to an amount equal to the cost of upkeep, a trustee merely of the moneys paid in, and the State's general

Net Earnings of a Department.

revenue fund in entitled only to the surplus paid in to the State Treasury after deducting expenses of the operation of such department. For strictly speaking, in such case the appropriation is not made out of the general revenue of the State, but out of the earnings of the department. By the very terms of the attached condition, the officers would not be paid in full, or at all if no fees were earned (e. g., Hay and Grain Inspection Department, Laws 1913, p. 367, sec. 41, Laws 1913, p. 9, sec. 12b; Text-Book Filing Fund, sec. 10955, R. S. 1909). So to all such the term "revenue" means net revenue. This in fact is the present rule by statute as to the fees of the clerk of this court and likewise as to the fees of the clerks of the several Courts of Appeals.

As to other departments and the earnings thereof, when payment of operating expenses is in no wise conditioned upon earnings, and which earnings go directly by express statute into the State Treasury, the gross sum of earnings is to be considered ordinary revenue, e. g., earnings of the Public Service Commission; earnings of the Secretary of State (sec. 10718, R. S. 1909); earnings of the State Auditor (sec. 1276, R. S. 1909), etc. This for the reason that the statutes provide for the payment of the expenses of all of these departments whether they earn fees or not, and because all of such fees earned by the former (Laws 1913, p. 567, sec. 21) as well as those earned by the two latter, are by statutes required to be paid into the State Treasury (secs. 10716, 10717, 10718, R. S. 1909) to the credit of the revenue fund.

*Earnings of Auditor, Etc.*

VII. It is patent that interest accruing to the State from moneys deposited in banks, or other State depositaries, is to be considered as "ordinary revenue" within the purview of the appropriation act under discussion, and in the light

*Interest.*

266Mo.27

of our construction of the words "ordinary revenue," supra, save and except in such cases (if such there be) wherein the interest accrues from a special fund, and by express provision of law is required to be expended for the identical purpose of the special fund, from which it accrued. [Cf. Act. of March 24, 1911, sec. 10, p. 114, Laws 1911.]

VIII. From the rules which we are impelled to formulate from our view of the law, we are of opinion that the fines assessed against the Arkansas Lumber Co. and others in the suit of State ex inf. v. Arkansas Lumber Co., 260 Mo. 212, are not to be taken into account but wholly excluded. (Such fines have never been taken into account heretofore in this behalf by any State Auditor.) This, for the reason that while it is undoubtedly revenue, it is not *ordinary* revenue, because it is not annual or current, but wholly adventitious and in the nature of a "windfall," if we may use an horticultural expression.

Likewise item 32, the same being the moneys which have been intermittently, for some years prior, and which were, by act of the last Legislature, transferred from the "Insurance Department Fund" to the general revenue fund, is not to be taken into account. This for the reasons that these moneys are not annual, or current revenue; and because they are required to be paid into a special fund (Sec. 6884, R. S. 1909) and because only the "overflow" from this fund reaches the State revenue fund, and *then only pursuant to an express and special act passed,* ordinarily, biennially, transferring a portion of such fund to State revenue. [Laws 1915, sec. 55a, p. 20; Laws 1913, sec. 79, p. 30.] We say "ordinarily biennially," for the reason that we have been unable to find any general statute making such transfer mandatory upon each or any Leg-

islature, and note that no such transfer was made in 1905, or in 1895. This item has never been included heretofore.

IX. Neither the gross income, nor the net income, from the Factory Inspection Fund should be taken into account, for the reasons: (a) such income, **Factory Inspection.** or fees, go into a special fund, viz.: "the Factory Inspection Fund," and are not annually paid into general revenue; (b) this fund is primarily to be devoted to the payment of the expenses of the Factory Inspection Department, and no excess of expense over income of the department can be made up from general state revenue, and (c) the income to the general revenue fund of the State, if any, is not paid in regular and usual *annual* payments, but biennially only. [Sec. 7826, R. S. 1909.]

X. The question of whether the earnings of the examiners appointed by the State Auditor and whose duty it is to examine and audit the books of the several counties and of divers state institutions, in the act more specifically set out (Laws 1913, pp. 765 et seq.), presents much of difficulty. Clearly this branch of the Treasury Department is not designed to be an earner of revenue; neither has it earned any, for the agreed facts show that the income therefrom in the biennial period here under discussion was substantially equal to the expense thereof. Pertinent parts of the statute creating this department provide thus:

"The examiner making such examination shall make out his account under oath and forward same in duplicate to the State Auditor, one copy of which shall be filed in the office of the State Auditor and the other forwarded by the State Auditor to the county court of said county or the proper officers of the city of St. Louis, who shall draw a warrant at their first meeting in payment of same and remit said amount to the examiner making the examination, addressed

to Jefferson City, Mo., in care of the State Auditor: Provided, that any of the regularly appointed examiners whose time is spent in the auditing of accounts of any county and receives a *per diem* of $7.50 for same, the amount so received from the county shall be deducted from the $2,000 authorized by this act to be paid to him from the public treasury, in order that in no case shall an examiner's salary be in excess of $2000; and provided further, that whenever the *per diem* of any regular examiner exceeds the amount of $2000, the salary allowed him by this act, the excess, if there be any, shall be paid into the State Treasury to the credit of the State Revenue Fund." [Laws 1913, p. 767, sec. 5.]

In substantial accordance with the rules of construction which we have reached and laid down, we hold that this item should not be taken into account in this action, but net income therefrom, if any such there may hereafter be, should be included.

XI. It follows, then, that all of the items 5 to 17, to-wit:

5. Notaries' commissions;
6. Land department fees;
7. Fees earned in office of State Auditor;
8. Fees earned by office of Secretary of State;
9. Incorporation tax;
10. Fees from Excise Commissioner of city of St. Louis;
11. Proceeds of sale of beer stamps;
12. Interest received from State depositaries;
13. Sale of oil stamps;
14. Interest on deposit of fees by St. Louis Excise Commissioner;
15. Interest on deposit of Fish Commission;
16. Excess fees from clerk of Supreme Court, clerk of St. Louis Court of Appeals, clerk of Springfield Court of Appeals, clerk of Kansas City Court of Appeals;
17. Fees collected by Excise Commissioners of St. Louis county;

both inclusive, are to be taken into account and included in "ordinary revenue" within the purview of the statute in dispute; for the reasons that said

items 5, 6, 7, 8, 9, 10, 11, 13, 16 and 17 are clearly "regular and usual annual income of the State . . . which is subject to appropriation for general public purposes." Moneys are derived from these several items every year. These several sums are paid into the general treasury of the State for the revenue fund, pursuant to general laws, and subject to no restrictions limiting their application; items 12, 14 and 15, supra, because they each represent interest paid upon deposits of State moneys, absent a statute requiring such interest to follow in use a specifically restricted principal.

That items 18, 22, 28, 29, 30 and 35, to-wit:

18. Receipts from sale of laws; ·
22. Receipts from fees of Poultry Experiment Station;
28. Receipts from fees of Bureau of Labor;
29. Receipts from fees of Board of Agriculture;
30. Receipts from fees of Fruit Experiment Station;
35. Receipts from fees of Public Service Commission:

and the *net income* of fees from items 23 and 34, to-wit, the Warehouse and Grain Inspection Department, and the Text-Book Filing Fund, are likewise to be so included. What we say last above forms, we think, a sufficient reason for so including items 18, 22, 28, 29, 30 and 35. Our views and reason for excluding the gross income, but for including the net income, of the last above several items numbered 23 and 34 have been herein before set out at length.

All other items in dispute, since they do not fall within the purview of the definitions and conclusions reached by us and discussed either specifically or generally hereinabove, are to be excluded. While on first blush an apparently though not really arbitrary rule may seem to be invoked as to such items as come into the general revenue fund of the State biennially only (e. g., Factory Inspection Fund), or biennially, but intermittently, and by virtue of an express special act (e. g., transfer from Insurance Department Fund),

or occasionally and adventitiously (e. g., fines accruing from prosecutions of lumber companies, State ex inf. v. Arkansas Lumber Co. et al., 260 Mo. 212), yet upon more careful thought and consideration it will be seen that a crying necessity exists for a general rule to use in setting apart this fund, which will forever dissipate the dark obscurity which has heretofore befogged it, and that no such rule can be logically formulated, which will serve to measure all cases, if these items are to be included. This is the administrative difficulty; if it be wrongly resolved a word from the Legislature can correct it. Besides, it may well be that these rules which we have formulated as the only consistent interpretation of the legislative intent derivable from the language of the appropriation act under discussion, will serve to obviate fat and lean years in public school revenues, and that it was so intended. That those in charge of such schools may confidently rely upon a fairly fixed and stable income, and that they may not be induced to lavish and waste funds this year and be forced to a too lean and scrimping economy next year, is a *desideratum* to be wished for. The conclusions here reached bring this to pass and are yet, we think, in line with the law both here and elsewhere. The rule allows full latitude for a growth of the State, a condition fully demonstrated by the fact that the amount below set apart from State revenues for the support of the public school system exceeds by many thousands of dollars any appropriation for any one year ever before so devoted, from this source.

Amending the petition (which by stipulation stands as and for the alternative writ, issuance of which was waived), as provided by the agreed facts, we eliminate all items except as last above enumerated and found to be within the purview of the appropriation act and award the writ as to such items.

It is therefore our order that our peremptory writ go for the sum of $334,189.31, being the aggregate of

the one-third part of the items aforesaid, and making, with the sum already set apart and certified by respondent for the use of the public schools for the fiscal year 1915, a grand total of $1,757,933.43.  Let our peremptory writ so issue.  All concur.