Paul C. Wilson, Judge
Staff of the Public Service Commission ("Commission") filed a complaint alleging Union Electric Co. ("Ameren") violated a Commission rule when it failed to use certain 2014 data to calculate Ameren's "net shared benefits" under an energy-efficiency plan approved by the Commission in 2012. Staff and Ameren filed motions for summary determination and, following briefing and argument, the Commission granted Staff's motion for summary determination. Ameren appealed, and this Court has jurisdiction under article V, section 10, of the Missouri Constitution.
It is not without some trepidation that the Court forays into the complex subjects at issue in this case. But buried beneath the blizzard of acronyms and torrents of technicalities lies a simple issue well within the competency of this Court to determine, i.e., the meaning of the term "methodology" as used in Rule 20.093(1)(F). The Commission determined "methodology" in this context means not only the formula used to compute a sum (i.e., the variables to be used) but also the values of those variables. This was error. Accordingly, because the Commission's erroneous determination of the meaning of the term "methodology" played a central role in its decision, that decision is vacated, and this matter is remanded *534 to the Commission for further proceedings consistent with this opinion.[1]
Background
As a general matter, utilities such as Ameren recover their costs (plus a reasonable return on their investments) through the sale of electricity at the rates set by the Commission. As a result, Ameren has little or no incentive to encourage energy efficient practices by its customers because, again generally, the more electricity Ameren sells the more money it makes. To remove this disincentive and encourage utilities to develop and implement programs encouraging energy efficient practices by its customers, the legislature enacted the Missouri Energy Efficiency Investment Act ("the Act"), see § 393.1075, RSMo, et seq.[2]
Under the Act, the Commission is authorized to "develop cost recovery mechanisms to further encourage investments in demand-side programs[3] including ... allowing the utility to retain a portion of the net benefits of a demand-side program for its shareholders." § 393.1075.5. The Commission promulgated detailed regulations[4] allowing utilities to seek Commission approval of a "[d]emand-side programs investment mechanism, or DSIM." Rules 3.163(1)(F), 20.093(1)(M). These regulations provide that a DSIM is "a mechanism ... to encourage investments in demand-side programs," and may include "[r]ecovery of lost revenues" resulting from decreased electricity consumption, and a "[u]tility incentive based on the achieved performance level of approved demand-side programs." Id. The utility incentive component is implemented through a "DSIM utility incentive revenue requirement," which is designed "to provide the utility with a portion of annual net shared benefits based on the approved utility incentive component of a DSIM." Rules 3.163(1)(J), 20.093(1)(Q) (emphasis added).
This case concerns the calculation of Ameren's share of the "annual net shared benefits" produced by its Commission-approved programs. "[A]nnual net shared benefits" is defined to mean:
the utility's avoided costs measured and documented through evaluation, measurement, and verification (EM&V) reports for approved demand-side programs less the sum of the programs' costs including design, administration, delivery, end-use measures, incentives, EM&V, utility market potential studies, and technical resource manual on an annual basis.
Rules 3.163(1)(A), 20.093(1)(C). "Avoided costs" is defined to mean:
the cost savings obtained by substituting demand-side programs for existing and new supply-side resources. Avoided costs include avoided utility costs resulting from demand-side programs' energy savings and demand savings associated with generation, transmission, and distribution facilities including avoided probable environmental compliance costs. The utility shall use the same methodology used in its most recently *535 adopted preferred resource plan[5] to calculate its avoided costs.
Rules 3.163(1)(C), 20.093(1)(F).
In January 2012, Ameren submitted to the Commission its proposed 2013-2015 Energy Efficiency Plan ("Plan") covering the energy-efficiency measures it would implement during this period and the terms under which it would be compensated for those measures. Following a stipulation between Ameren and others modifying some of the Plan's terms, the Commission approved the Plan in August 2012.
The details of the DSIM proposed by Ameren are not relevant to this appeal. What is relevant is how the Plan proposed to calculate its share of the annual net shared benefits. Ameren proposed that it be entitled to a share of net shared benefits to compensate it for two separate disincentives associated with demand-side programs: (1) the throughput disincentive (representing lost revenues from foregone electricity sales); and (2) the loss of earnings opportunities associated with supply-side investments (which would be compensated by a "performance incentive"). The Plan proposed each of these disincentives be addressed by permitting Ameren to retain a separate specified percentage of net shared benefits.
Ameren estimated the present value of the total net benefits that would be achieved by implementing its Energy Efficiency Plan would be $364.3 million. It estimated the present value of three years of lost net income associated with decreased electricity consumption (i.e., the throughput disincentive) was $56 million and the present value of the performance incentive necessary to compensate for lost earnings opportunities was $17 million. Ameren, therefore, proposed a total net benefit sharing percentage of 20.2 percent (assuming it achieved 100 percent of the Plan's performance targets), which would entitle it to retain a portion of the program's net benefits having a total present value of $73 million.
Determining net shared benefits, and Ameren's share of those benefits, requires consideration of a number of factors. First, total energy savings-calculated by multiplying the estimated number of customers who would actually implement each of Ameren's different energy-efficiency measures (i.e., the total customers minus the "opt out customers") times the estimated energy savings in megawatt hours for each of these measures. Second, avoided costs-calculated, in simple terms, by multiplying the total estimated energy savings above (in megawatt hours) times a per-hour estimate of the costs (e.g., the costs of energy production, energy transmission and distribution, and environmental compliance) Ameren would have incurred had it supplied that energy.[6]
*536 Understandably, the foregoing description (though highly generalized) is dauntingly complex. But this description does highlight the key role played by the "avoided costs estimate," i.e., the estimated cost to Ameren to supply each megawatt of energy during the succeeding three years of the Plan. Many, if not most, of the factors affecting those costs-including, most notably, Ameren's fuel costs over the next three years-were beyond Ameren's control and very difficult to measure. Because those factors would have a significant impact on Ameren's potential recovery over the Plan-and, therefore, on Ameren's willingness to volunteer the Plan in the first place-the question of whether this "avoided costs" variable would be fixed at the outset or calculated using actual costs during and at the end of the Plan was a highly material-perhaps even central-question. Because it was so material, one would have expected Ameren to address the issue expressly in its Plan. It did.
Ameren's Energy Efficiency Plan clearly provides the estimates of avoided costs due to decreased energy consumption would not be updated during the life of the Plan as part of the calculation of Ameren's performance incentive. The Plan explains:
[T]he mechanics of sharing net benefits need to be precisely defined. Table 2.12 shows the items associated with estimating net benefits and whether those items will be updated for purposes of assessing performance and benefits as part of the implementation process. Notice that several items will not be updated, so the focus remains on the cost of the programs and the number of measures implemented. The TRM [Technical Resource Manual] provides significant value in simplifying this process as several important inputs are deemed.
The following is a reproduction of Table 2.12 of the Plan, referred to in the preceding quote:
Category Update? Description Avoid Costs X The avoided energy, capacity, and T&D values are deemed Measure Attributes X The TRM provides the deemed values or protocols for all measures DSMore Software X XLS Version 5.0.14, GCG Version 5.0.23 Number of Measures ? The number of measures will be measured as part of the evaluation process Program Admin. Costs ? The direct program costs will be tracked Measure Rebate Costs ? Measure rebates are included in the direct program costs Net-to-Gross Factors X The TRM provides the deemed values Customer Opt-Out ? The final performance goals shall be adjusted based on final opt-out estimates Discount Rate X The discount rate shall remain 6.95%
Both the text of the Plan and the very first line of Table 2.12 plainly and unambiguously provide avoided energy costs would be "deemed" at the outset of the Plan, i.e., they would not be updated based upon actual experience during the three-year *537 life of the Plan. The only items that would be updated before determining Ameren's share of the net benefits were: (1) the number of energy-efficiency measures actually implemented; (2) the costs of the energy-efficiency program, including rebate costs; and (3) the percentage of customers who opted out of the program.
There is no dispute this is what the Plan provided. The Commission's Report and Order expressly recognize that, under the Plan, Ameren is correct that it need not update its avoided costs estimates for purposes of calculating net shared benefits. The Commission expressly found "the DSIM as proposed by Ameren Missouri in its 2012 MEEIA filing, specifically, subsection 2.6 and Table 2.12 of that filing, does not allow for the use of updated avoided cost estimates ." (Emphasis added). Although the Commission went on to hold the terms of the Plan were inconsistent with (and, therefore, subject to) Rules 3.163(1)(C) and 20.093(1)(F) defining "avoided costs," it plainly understood Ameren would prevail under the Plan alone.[7]
Of course, the Commission did not approve the Plan as submitted. Instead, it approved it subject to changes agreed upon in a stipulation among all the parties (the "Unanimous Stipulation"). But nothing in the Unanimous Stipulation alters the plain and unambiguous statements in Ameren's Plan that avoided costs estimates would not be updated.
The Unanimous Stipulation begins by making clear the parties agreed Ameren's Energy Efficiency Plan should be approved, subject to the modifications contained in the Stipulation itself.
4. Approval of Plan. Subject to the terms and conditions contained herein, the Signatories agree that Ameren Missouri's demandside program plan should be approved. For purposes of this Stipulation, Ameren Missouri's three-year demand-side program plan (the "Plan") consists of the 11 demand-side programs ("MEEIA Programs") described in Ameren Missouri's January 20, 2012 MEEIA Report, the demand-side programs investment mechanism ("DSIM") described in the MEEIA Report, modified to reflect the terms and conditions herein, and the Technical Resource Manual ("TRM") attached as Appendix A to the surrebuttal testimony of Ameren Missouri witness Richard A. Voytas.
Therefore, except as modified by the Unanimous Stipulation itself, the parties recommended Ameren's Plan be approved.
The Unanimous Stipulation provides "Ameren Missouri will be allowed to recover the performance incentive, which is a percentage of [net shared benefits or] NSB as described on Appendix B." Notably, the performance incentive discussion in the Unanimous Stipulation describes the use of only two actual, updated figures to calculate net shared benefits: (1) actual net energy savings as determined through the Evaluation, Measurement and Verification ("EM&V") process; and (2) actual number of customer opt-outs.
Similarly, Appendix B to the Unanimous Stipulation, addressing the performance incentive calculation, states, "Actual net benefits are based on actual program costs for the three-year MEEIA plan and the actual net MWh savings as determined by EM&V." The Unanimous Stipulation's discussion of the performance incentive makes no reference to any other element of the net shared benefits calculation and expresses no intent to modify any other aspect of the Plan's discussion of net shared benefits and the performance incentive. Instead-and consistent with Table *538 2.12-the Stipulation refers to the use of actual, updated figures only with respect to: (1) Ameren's energy-efficiency program costs; (2) the determination of actual energy savings (based on the number of energy-efficiency measures actually implemented); and (3) the number of customers who opted out of the energy-efficiency program. Because the Unanimous Stipulation did not modify the statements in Ameren's Plan that avoided costs estimates would not be updated in calculating net shared benefits, those terms in the Plan were approved by the Commission and govern the resolution of the issue in this case. See Rule 20.093(2)(J) ("If the commission approves [the] utility incentive component of a DSIM, ... [it] shall be binding on the commission for the entire term of the DSIM ... unless otherwise ordered or conditioned by the commission when approved.").
The Commission approved the Plan (as modified by the Unanimous Stipulation) in August 2012. At that time, Ameren's most recently adopted PRP had been approved by the Commission in 2011. The avoided costs methodology in the 2011 PRP was carried into Ameren's Plan and approved by the Commission, albeit with different avoided costs data. In 2014, Ameren filed new IRPs and the Commission approved a new PRP. Even though the avoided costs estimates in the 2011 PRP, the Plan, and the 2014 PRP differed (because the values of the variables used in those formulae differed over time), the basic formula-or methodology-used to calculate those estimates never changed.
In 2015, Ameren calculated and reported its annual net shared benefits under the Plan for the last quarter of program year 2014. As part of that mathematical process, Ameren calculated its avoided costs by using the formula-or methodology-for avoided costs estimates in its 2014 PRP but using the "deemed" values for certain variables as set forth in the Plan.
Staff later filed a complaint alleging Ameren failed to use the avoided costs estimates from its 2014 PRP, including the updated values for the variables used in calculating those estimates found in that PRP. Staff alleged this violated Rule 20.093(1)(F), which provides that Ameren must calculate its avoided costs by "us[ing] the same methodology used in its most recently-adopted preferred resource plan"-namely, the 2014 PRP. (Emphasis added).[8] Staff reasoned the word "methodology" in this rule included not only the formula used to calculate avoided costs, but the values of the variables in that formula as well.
Ameren disagreed, arguing the plain and ordinary meaning of the term "methodology" referred only to the method or formula for calculating avoided costs and did not include the values (inputs) for the variables in that formula. Ameren insisted it was not required to update its avoided costs estimate data under the Plan. As noted above, the Commission agreed with Ameren's interpretation of the Plan but ruled in favor of Staff because it adopted Staff's interpretation of Rule 20.093(1)(F). Because the Commission ruled Ameren had never received a variance from Rule 20.093(1)(F), Ameren was required to use the avoided costs estimates-both the formula and the values for the variables-from its 2014 PRP when calculating net shared benefits under the Plan for the last quarter of 2014.
Analysis
Because the Commission's decision is presumed valid, this Court must affirm *539 unless Ameren shows the decision is "unlawful" or "unreasonable." Office of Pub. Counsel v. Mo. Pub. Serv. Comm'n , 409 S.W.3d 371, 375 (Mo. banc 2013). The parties agree the Commission's decision is lawful because the Commission had "statutory authority" to entertain Staff's complaint and decide whether Ameren violated a Commission rule. Id. The dispute in this case is whether the Commission's decision is reasonable. This Court often has said a Commission decision is reasonable if it "is supported by substantial, competent evidence on the whole record," it is "not arbitrary or capricious," and it is not based on an "abuse[ of] its discretion." Id.
Here, none of the material facts are in dispute, and the parties' briefs make clear the reasonableness of the Commission's decision essentially hinges on two issues, both of which require a legal interpretation of various texts: (1) whether the Plan approved by the Commission following the Unanimous Stipulation required Ameren to update its avoided costs estimates; and (2) whether Rule 20.093(1)(F), from which Ameren did not obtain a variance, required Ameren to update its avoided costs estimates. Both issues are questions of law. See State ex rel. Pinkerton v. Fahnestock , 531 S.W.3d 36, 44 (Mo. banc 2017) (interpretation of a contract); see also Doe v. St. Louis Cmty. Coll. , 526 S.W.3d 329, 335 (Mo. App. E.D. 2017) (interpretation of a rule). Because the proper interpretation of the Plan and the rule are legal issues, this Court need not afford the Commission's interpretation any deference. See Love 1979 Partners v. Pub. Serv. Comm'n of Mo. , 715 S.W.2d 482, 486 (Mo. banc 1986).[9] Instead, the Court reviews these issues de novo , Pierce v. BSC, Inc. , 207 S.W.3d 619, 621 (Mo. banc 2006), and it exercises "independent judgment" to "correct erroneous interpretations." Burlington N. R.R. v. Dir. of Revenue , 785 S.W.2d 272, 273 (Mo. banc 1990).
I.
As noted above, the Court holds the Plan, as modified by the Unanimous Stipulation and approved by the Commission, does not require Ameren to update the values of the variables regarding avoided energy costs when calculating net shared benefits. The Plan (including Table 2.12 and the accompanying text) expressly provides as much, the Commission expressly concluded as much, and the Court finds no error in that conclusion.
Staff argues paragraph 5.b.ii of the Unanimous Stipulation modified the Plan and required Ameren to update its avoided costs estimates. Staff does not argue paragraph 5.b.ii expressly addresses this issue, nor could it do so given that paragraph 5.b.ii does not mention "avoided costs." Instead, Staff argues paragraph 5.b.ii modified the Plan by implication because this paragraph requires annual evaluation, measurement, and verification reports for the purpose of assessing consumer energy savings, a variable that bears on Ameren's share of net shared benefits.[10] Because paragraph 5.b.ii requires *540 updated consumer energy savings data, Staff appears to argue this paragraph also implicitly requires updated avoided costs estimates. The Court disagrees.
Even though the EM&V process bears on one variable that determines Ameren's share of net shared benefits (consumer energy savings), Staff conceded in its pleadings-and the Commission specifically found-the EM&V process does not determine Ameren's avoided costs, which is the variable at issue in this appeal. Moreover, even if the Court were to assume for the sake of argument that reasonable minds might differ as to whether paragraph 5.b.ii implicitly requires Ameren to update its avoided costs estimates, this ambiguity could not be resolved in Staff's favor under the circumstances. When Ameren calculated its annual net shared benefits in 2013 and part of 2014 without updating its avoided costs estimates, Staff concedes it "expressed no concerns or objections, formally or informally, regarding [these] calculations." Staff's conduct strongly counsels against its interpretation of paragraph 5.b.ii because "[i]t is well established that in construing an ambiguous or disputed [agreement,] the interpretation the parties placed on it by their conduct is of great weight in determining what the agreement actually was." Landau v. Laughren , 357 S.W.2d 74, 80 (Mo. banc 1962) (citations omitted).
Here, it is fairly evident from Staff's conduct that Staff, like Ameren, was under the impression paragraph 5.b.ii did not require Ameren to update its avoided costs estimates when calculating its annual net shared benefits. Since Staff's current interpretation of paragraph 5.b.ii is at odds with (among other things) its own conduct over a significant portion of the Plan's life, the Court would not adopt Staff's interpretation even if the Court were to assume there was some ambiguity as to whether paragraph 5.b.ii implicitly requires Ameren to update its avoided costs estimates.
Accordingly, this Court holds neither the Plan nor the Unanimous Stipulation required Ameren to update its avoided costs estimate data when calculating the annual net shared benefits. The Plan unambiguously states Ameren was not required to do so, and nothing in the Unanimous Stipulation dictates otherwise. Paragraph 5.b.ii, upon which Staff relies, is completely devoid of language supporting Staff's argument, and the Court rejects Staff's argument that the EM&V details in paragraph 5.b.ii (which are wholly unrelated to avoided costs estimates) somehow implicitly require Ameren to update its avoided costs estimates.
*541 II.
Even though the Commission properly determined the Plan (as modified by the Unanimous Stipulation) did not require Ameren to update its avoided costs estimate data, the Commission ruled against Ameren on the ground that Rule 20.093(1)(F) required Ameren to do so and the rule controlled over the terms of the Plan because Ameren had never sought or received a variance from that rule. Specifically, Rule 20.093(1)(F) provides Ameren must calculate its avoided costs by "us[ing] the same methodology" found in its 2014 PRP and the Commission concluded the term "methodology" meant not only the method or formula for calculating avoided costs from the 2014 PRP but also the values from that PRP for the variables in the formula.
Ameren argues the Commission's decision is "unreasonable" because it rests upon an erroneous interpretation of Rule 20.093(1)(F), in that the Commission's interpretation ignores the plain and ordinary meaning of the word "methodology." This Court agrees.
Because the term "methodology" has not been defined by the legislature or the Commission, this Court will presume the term bears its "plain and ordinary meaning as derived from the dictionary." State v. Jones , 479 S.W.3d 100, 107 (Mo. banc 2016) (citation omitted). Employing that approach here, the term "methodology" means: "the processes, techniques, or approaches employed in the solution of a problem or in doing something." Webster's Third New International Dictionary of the English Language Unabridged 1423 (1966). Accordingly, this rule requires Ameren to calculate its avoided costs by using the method or formula for calculating avoided costs found in its 2014 PRP, but it does not-as the Commission concluded-require Ameren to use both that formula and the actual values from its 2014 PRP for the variables in the formula. The Commission's conclusion to the contrary was unreasonable.
Indeed, the Commission's interpretation of the word "methodology" leads to unacceptable results. For example, if Rule 20.093(1)(F) requires Ameren to use not only the same formula for calculating avoided costs from its most recent PRP but also the actual data used in that PRP, then Ameren and the Commission necessarily violated this rule in the Plan. The Plan used the same method or formula for calculating avoided costs from Ameren's 2011 PRP, but the Plan did not use the same data as in that PRP. Instead, the Plan used new data-which the Plan noted would be "deemed" throughout the life of the Plan-and the Commission approved it. This conundrum evaporates, however, if the term "methodology" bears its ordinary meaning. Staff's arguments to the contrary are unsupported by the record and logically unpersuasive.
Moreover, nothing in the record suggests the interpretation of Rule 20.093(1)(F) adopted by the Commission in its decision in this case was the interpretation the Commission employed in 2012 when Ameren submitted and it approved the Plan. If, as it now contends, the Commission was so certain the plain and unambiguous terms of the Plan were at odds with Rule 20.093(1)(F), it is reasonable to assume it or the Staff would have mentioned it. There is no sign that the issue was raised. See Ewing v. Vernon Cty. , 216 Mo. 681, 116 S.W. 518, 520 (Mo. 1909). The Commission's conduct is understandable, however, if one assumes the Commission then thought Rule 20.093(1)(F) did not require Ameren to use updated avoided costs data from its most recently adopted PRP, as the plain meaning of the language of the rule provides.
*542 Finally, the Commission's construction of the term "methodology" in Rule 20.093(1)(F) cannot be applied to other uses of that term in the Commission's regulations without creating unacceptable inconsistencies. Rule 20.093(1)(EE) provides the performance incentive component of an energy-efficiency plan is "the methodology approved by the [C]ommission in a utility's filing for [energy-efficiency] program approval [that] allow[s] the utility to receive a portion of annual net shared benefits." If this "methodology" includes both the formula and that data set forth in Ameren's Plan, then Ameren could never comply with this rule and Rule 20.093(1)(F), which the Commission interprets to mean that Ameren must use both the formula and the data from its 2014 PRP when calculating the same information. Rules concerning the same subject matter-like Rule 20.093(1)(F) and Rule 20.093(1)(EE)-should be interpreted in a way that renders them complementary (rather than contradictory) whenever that is fairly possible. State ex rel. Evans v. Brown Builders Elec. Co. , 254 S.W.3d 31, 35 (Mo. banc 2008). All contradictions fall away, however, if the term "methodology" is given its plain and ordinary meaning in both Rule 20.093(1)(F) and Rule 20.093(1)(EE), i.e., that this terms refers only to the method or formula used to calculate net shared benefits and not both the formula and the values for the variables in that formula.
Despite the implausibility and inconsistency of the Commission's interpretation, Staff argues this Court should affirm the Commission's decision because, if "methodology" does not include both the formula and the data used in that formula, Ameren would never be able to calculate its avoided costs. To be sure, a formula cannot be used unless there are values to plug into the various variables, but that does not mean the term "methodology" in Rule 20.093(1)(F) must refer to both. The Plan unambiguously stated Ameren would use certain values set forth in the Plan, even though the rule requires it to use the formula set forth in its most recent PRP (i.e., the 2011 PRP at the time the Plan was proposed and the 2014 PRP at the time the calculations at issue in this case were made).
The main thrust of Staff's argument is the Commission's decision should be sustained because the Commission could reasonably conclude that requiring Ameren to use the avoided costs estimates found in its 2014 PRP would further the purpose of the Act and yield more reasonable or desirable results. But there must be some ambiguity in the rule before this Court can look to interpretative aids such as the nature and purpose of the Act as a whole as a way of resolving it. Here, the term "methodology" in Rule 20.093(1)(F) is not ambiguous and the Court cannot affirm the Commission's contrary interpretation simply because doing so would better suit Staff's view of the purpose of the Act. See Lackland v. Walker , 151 Mo. 210, 52 S.W. 414, 430 (Mo. 1899) (explaining an expression of purpose in a preamble cannot be used to interpret a statute unless the text is "doubtful or ambiguous").
Accordingly, the Court holds the Commission's decision is "unreasonable" because it is based on an erroneous interpretation of Rule 20.093(1)(F). That rule required Ameren to calculate its avoided costs by "us[ing] the same methodology" found in its 2014 PRP. The term "methodology" in this context is "not subject to more than one reasonable interpretation." State v. Liberty , 370 S.W.3d 537, 548 (Mo. banc 2012). It means only the method or formula for calculating net shared benefits and not both the formula and the avoided costs values needed for the variables in that formula. Even if that outcome were more desirable, as Staff suggests, it cannot *543 be achieved simply through "the alchemy of construction." Textile Workers Union of Am. v. Lincoln Mills of Ala. , 353 U.S. 448, 462, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (Frankfurter, J., dissenting).
Conclusion
For the reasons set forth above, the Commission's decision in this matter is vacated, and the matter is remanded to the Commission for further proceedings consistent with this opinion.[11]
All concur.

Portions of this opinion are taken, without further attribution, from the opinion of Judge Alok Ahuja in the court of appeals.

Unless otherwise noted, all statutory citations refer to the 2017 Supplement to the 2016 Revised Statutes of Missouri.

A "demand-side program" is defined as "any program conducted by the utility to modify the net consumption of electricity on the retail customer's side of the electric meter, including but not limited to energy efficiency measures, rate management, demand response, and interruptible or curtailable load." § 393.1075.2(3).

The Act grants the Commission authority to promulgate rules implementing its provisions. See § 393.1075.11.

Every three years, utilities such as Ameren submit a series of integrated resource plans ("IRP") detailing (among other things) their plans for meeting their consumers' energy demands over the next 20 years. The utility selects one of these plans, which then becomes its preferred resource plan ("PRP"). See generally 4 CSR 240-22.060(4). The PRP must contain a vast amount of data, including avoided costs estimates.

This gross annual benefit would then be reduced to a net annual benefit by factoring in the costs to Ameren of implementing the energy-efficiency measures. The net annual benefit would then be summed over the three years of the Plan and reduced to present value using a discount rate. Finally, under the Plan, Ameren's percentage share of these net shared benefits would vary based upon its performance (in terms of total energy savings) compared with a goal stated in the Plan. The Plan specified Ameren's performance goal would be adjusted based on the number of customers who opted out of the energy-efficiency program. Therefore, it would be necessary to determine the actual number of opt-outs before the amount of Ameren's share of net shared benefits could be determined.

At oral argument before the Commission, counsel for Staff and the Office of Public Counsel agreed that, under the Plan, there was no dispute avoided costs estimates would not be updated.

Had Ameren used the avoided costs estimates in its 2014 PRP, the final calculation would have yielded a smaller share of net shared benefits because the estimated cost of electricity production (a variable bearing on avoided costs) fell between 2012 and 2014.

To be clear, if the meaning of a statute or regulation enforced by the Commission is ambiguous and the canons of construction cannot resolve the issue, this Court is entitled to give weight to a textually permissible interpretation adopted by the Commission. State ex rel. Gass v. Gordon , 266 Mo. 394, 181 S.W. 1016, 1021-22 (Mo. 1915). Such is not the case here, however, because Rule 20.093(1)(F) is not ambiguous. See Foremost Dairies, Inc. v. Thomason , 384 S.W.2d 651, 659 (Mo. banc 1964) (affording no deference to an agency's interpretation because the ambiguity could be resolved by resorting to the canons of construction).

In pertinent part, paragraph 5.b.ii reads as follows:
[Net Shared Benefits] Relating to Performance Incentive. After the conclusion of the three-year Plan period, using final [EM&V] results (with EM&V to be performed after each of the program years ...), Ameren Missouri will be allowed to recover the performance incentive, which is a percentage of [net shared benefits (the "Performance Incentive Award") ].... The cumulative net megawatt-hours ("MWh") determined through EM&V to have been saved as a result of the [energy-efficiency programs] will be used to determine the amount of Ameren Missouri's Performance Incentive Award, with the cumulative net MWh performance achievement level (expressed as a percentage) being equal to cumulative net MWh savings determined through EM&V divided by Ameren Missouri's total targeted 793,100 MWh (which is the cumulative annual net MWh savings in the third year of the three-year Plan). The targeted net energy savings shall be adjusted annually for full program year impacts on targeted net energy savings caused by actual opt-out. Actual net energy savings for each program year will be determined through the EM&V, including full retrospective application of net-to-gross ratios at the program level using EM&V results from each of the three program years, with the sum of the three years' actual net energy savings to be used to determine the amount of the Performance Incentive Award.

The Court's disposition of this point renders it unnecessary for the Court to consider Ameren's points relied on arguing the Commission's decision violated Rule 20.093(2)(J) or is unreasonable in light of the purpose or policy of the Act.