Alok Ahuja, Judge
Kansas City Power & Light Company ("KCP&L") appeals a Report and Order issued by the Public Service Commission in KCP&L's most recent general rate case. The company raises two issues on appeal. KCP&L first argues that the Commission erroneously refused to allow it to adjust the electrical consumption during the test year used in the rate case, to reflect the impact of certain energy efficiency measures which KCP&L had implemented under the Missouri Energy Efficiency Investment Act ("MEEIA"), § 393.1075 et seq.[2] Second, KCP&L argues that the Commission erroneously refused to include electric vehicle charging stations constructed and operated by KCP&L in the utility's rate base, based on the Commission's determination that the charging stations were not "electric plant" within the meaning of § 386.020(14).
We reject KCP&L's challenge to the Commission's treatment of KCP&L's energy efficiency measures. We conclude, however, that the Commission erred when it held that KCP&L's electric vehicle charging stations did not fall within the statutory definition of "electric plant." We accordingly reverse that aspect of the Commission's Report and Order, and remand the case to the Commission for further proceedings consistent with this opinion.
Factual Background
KCP&L is an electric utility subject to Commission regulation. It provides electrical service to approximately 527,000 customers in the Kansas City metropolitan area and surrounding communities.
On July 1, 2016, KCP&L filed proposed tariffs designed to implement a general rate increase for electric utility service. The proposed tariffs had an effective date of July 31, 2016. The Commission suspended the proposed tariffs until May 28, 2017, to allow for full rate case proceedings.
KCP&L raises two issues on appeal. We discuss the facts relevant to each of those issues in the sections which follow.
1. Treatment of Cycle 1 Energy Efficiency Measures
The "test year" for KCP&L's rate case was the 12-month period ending December 31, 2015. As the Commission explained in its Report and Order,
A test year is a historical year used as the starting point for determining the basis for adjustments that are necessary to reflect annual revenues and operating costs in calculating any shortfall or excess *463 of earnings by the utility. Adjustments, such as annualization and normalization, are made to the test year results when the unadjusted results do not fairly represent the utility's most current annual level of existing revenue and operating costs.
(Footnote omitted.) The Report and Order explains that
[a] normalization adjustment is an adjustment made to reflect normal, on-going operations of the utility. Revenues or costs that were incurred in the test year that are determined to be atypical or abnormal will get specific rate treatment and generally require some type of adjustment to reflect normal or typical operations. The normalization process removes abnormal or unusual events from the cost of service calculations and replaces those events with normal levels of revenues or costs.
(Footnote omitted.) On the other hand, "[a]n annualization adjustment is made to a cost or revenue shown on the utility's books to reflect a full year's impact of that cost or revenue."
During the 2015 test year, KCP&L was implementing "Cycle 1" of an energy-efficiency program approved by the Commission pursuant to the Missouri Energy Efficiency Investment Act (or "MEEIA"). The Missouri Supreme Court recently described MEEIA's general purpose and operation in Missouri Public Service Commission v. Union Electric Co. , No. SC96222, 552 S.W.3d 532, 534, 2018 WL 3235705 (Mo. banc July 3, 2018) :
As a general matter, utilities ... recover their costs (plus a reasonable return on their investments) through the sale of electricity at the rates set by the Commission. As a result, [an electric utility] has little or no incentive to encourage energy efficient practices by its customers because, again generally, the more electricity [the utility] sells the more money it makes. To remove this disincentive and encourage utilities to develop and implement programs encouraging energy efficient practices by its customers, the legislature enacted the Missouri Energy Efficiency Investment Act ("the Act"), see § 393.1075, RSMo, et seq.
Under the Act, the Commission is authorized to "develop cost recovery mechanisms to further encourage investments in demand-side programs including ... allowing the utility to retain a portion of the net benefits of a demand-side program for its shareholders." § 393.1075.5. The Commission promulgated detailed regulations allowing utilities to seek Commission approval of a "[d]emand-side programs investment mechanism, or DSIM." Rules 3.163(1)(F), 20.093(1)(M). These regulations provide that a DSIM is "a mechanism ... to encourage investments in demand-side programs," and may include "[r]ecovery of lost revenues" resulting from decreased electricity consumption, and a "[u]tility incentive based on the achieved performance level of approved demand-side programs." Id.
Id. at *1 (footnotes omitted).
KCP&L's Cycle 1 energy-efficiency plan proposed to implement twelve different energy-saving initiatives, including supporting upgrades to eligible customers' residential lighting, kitchen appliances, air conditioning systems, and thermostats. KCP&L forecast that, during the 18-month life of the Cycle 1 program (from July 1, 2014 through December 31, 2015), energy consumption would be reduced by more than 102 million kilowatt hours. The Cycle 1 plan provided that the company would be compensated for lost revenues due to the decreased sale of electricity through a "Throughput Disincentive-Net *464 Shared Benefits" (or "TD-NSB") surcharge (which we describe in greater detail in § I of the Discussion which follows). KCP&L's Cycle 1 plan did not provide for any annualization adjustment for energy-saving measures which were implemented during the test year of a future rate case.
In August 2015, KCP&L filed for Commission approval of its "Cycle 2" energy-efficiency program. Unlike the Cycle 1 program (which relied exclusively on a TD-NSB mechanism to compensate KCP&L for lost revenues resulting from the implementation of energy-saving measures), the Cycle 2 program provided that KCP&L's lost revenues connected to its MEEIA program would be recovered through annualization adjustments to the electricity consumption figures used in subsequent rate cases. In other words, the Cycle 2 plan contemplated that, in future rate cases, KCP&L would reduce the electricity consumption figures during the test year, to reflect the full annualized effect of the energy-efficiency measures being implemented during the test year. These adjusted (i.e. , reduced) consumption figures would then be used in setting appropriate electricity rates going forward. The Stipulation embodying KCP&L's Cycle 2 plan provided for an annualization adjustment for "all active MEEIA programs."
In the current rate case KCP&L argued that electricity usage during the 2015 test year should be subject to an annualization adjustment to reflect the decreased electricity consumption related to the implementation of its Cycle 1 and Cycle 2 energy-efficiency programs. It contended that its Cycle 1 programs should trigger an annualization adjustment because those programs had the effect of reducing electricity consumption during the 2015 test year. KCP&L argued that the Cycle 1 programs which had an effect on electricity consumption in 2015 were "active MEEIA programs" within the meaning of the Cycle 2 Stipulation, and were accordingly subject to an annualization adjustment under the terms of the Cycle 2 Stipulation. KCP&L also relied on general ratemaking principles to argue that the Commission was required to consider all available information to determine the electricity consumption to be factored into KCP&L's forward-looking electricity rates. KCP&L argued that, if the Commission failed to make an annualization adjustment based on the consumption-reducing effects of its Cycle 1 programs, the Commission would overstate electricity consumption during the test year by more than 100 million kilowatt hours. KCP&L claimed that this overstated consumption estimate would cause KCP&L to fail to recover more than $6.6 million of its revenue requirement (because it would sell less electricity than the Commission had estimated when setting KCP&L's rates).
The Commission issued its Report and Order on May 3, 2017, with an effective date of May 13, 2017. In its Report and Order, the Commission rejected KCP&L's argument that it was entitled to an annualization adjustment for reduced electricity consumption attributable to measures implemented as part of its Cycle 1 energy-efficiency program. The Commission found that KCP&L's "lost revenues for Cycle 1 programs were already accounted for through operation of the TD-NSB in the MEEIA surcharge. Thus, granting KCP&L's request [for an annualization adjustment in the present rate case] would result in double recovery of assumed lost revenues." The Commission also concluded that "[t]he language 'all active MEEIA programs' in the Cycle 2 Stipulation does not allow KCPL to annualize kWh sales from its Cycle 1 demand-side programs."
2. Treatment of Electric Vehicle Charging Stations *465 As a separate issue, KCP&L requested as part of its rate case that its electric vehicle charging stations be included in rate base. KCP&L and KCP&L Greater Missouri Operations Company have launched an initiative to install and operate more than 1,000 electric vehicle charging stations throughout the greater Kansas City region. The total budgeted capital cost for the project is $16.6 million. The amount budgeted for the Missouri portion of this project is approximately $6 million.
The Commission concluded "that it lacks statutory authority over the proposed EV charging stations because they are not used for furnishing electricity for light, heat, or power," and therefore do not constitute "electric plant" within the meaning of § 386.020(14). The Report and Order explains:
EV charging stations are facilities that use specialized equipment, such as a specific cord and vehicle connector, to provide the service of charging a battery in an electric vehicle. The battery is the sole source of power to make the vehicle's wheels turn, the heater and air conditioner operate, and the headlights shine light. The charging service is the product being sold, not the electricity used to power the charging system.
By analogy, a laundromat uses electricity to provide clothes drying services, but that does not mean the laundromat's dryers are electric plant, or that the laundromat should be regulated by the Commission. EV charging stations are not "electric plant" and, therefore, the Commission lacks statutory authority to regulate their operation.
To rule otherwise would conceivably assert jurisdiction over other similar battery-charging services. Some examples would be smart phone charging stations or kiosks, RV parks that allow vehicles to connect to the park's electricity supply, or airports that connect planes to a hangar's electricity supply while parked, which the Missouri General Assembly could not have intended.
The Commission stated that the conclusion that electric vehicle charging stations are not "electric plant" was "further buttressed" by additional considerations. The Commission reasoned that Missouri's public service statutes were enacted to avoid "destructive competition" and "unnecessary duplication of service" in industries in which natural monopoly conditions exist, but that Commission regulation was inappropriate in "situations in which competition could serve a useful public purpose." The Commission concluded that including KCP&L's electric vehicle charging stations in rate base would not serve the public interest, but would distort what would otherwise be a competitive market:
If the charging stations go into rate base, utilities would receive a reasonable chance to recover a rate of return on that investment from ratepayers. This is problematic for services that can be considered both nonessential and/or in which a competitive market already exists. Allowing utilities to recover costs for such services from ratepayers effectively creates a regulatory barrier for new entries, unfairly punishes existing competition, and shifts risk from utility shareholders to ratepayers. Instead of promoting growth, an insulated regulated monopoly can undermine competition, which may reduce efficiency.
The Commission found that the risk of distorting the marketplace for electric vehicle charging services was particularly acute in the greater Kansas City area, because "[t]he Kansas [Corporation] Commission has denied KCPL's request to regulate EV charging stations," creating a situation in which "Kansas EV station owners would operate in a free-market *466 environment, while Missouri EV station owners would be working from a more traditional ratemaking model that builds in regulatory lag." The Commission also stated its view that, if charging stations were included in rate base, only electric vehicle owners and KCP&L shareholders would benefit, while "[n]on-participants, which would be many of KCPL['s] ratepayers, would bear most of the risk and cost."
Although the Commission concluded that the electric vehicle charging stations did not themselves constitute "electric plant," its Report and Order specifies that "KCPL may include in rate base any equipment, such as distribution lines, transformers, and meters, necessary to provide electric service to an owner of an EV charging station, whether or not that owner is affiliated with KCPL." In addition, although the Commission concluded that the operation of electric vehicle charging stations did not involve the sale of electricity, it ordered KCP&L to "file an amended tariff to revise the existing prohibition on the resale of electricity in order to clarify that EV charging stations are not reselling electricity."
Following the denial of its application for rehearing, KCP&L filed this appeal.
Standard of Review
Under section 386.510, the appellate standard of review of a PSC order is two-pronged: first, the reviewing court must determine whether the PSC's order is lawful; and second, the court must determine whether the order is reasonable. The PSC's order is prima facie lawful and reasonable. The burden of proof is upon the party attacking the order to show by clear and satisfactory evidence that the order or determination of the PSC is unlawful or unreasonable.
The lawfulness of an order is determined by whether statutory authority for its issuance exists, and all legal issues are reviewed de novo.
The decision of the PSC is reasonable where the order is supported by substantial, competent evidence on the whole record, the decision is not arbitrary or capricious, or where the PSC has not abused its discretion. "Substantial evidence" is competent evidence which, if true, has a probative force on the issues.
... The PSC's factual findings are presumptively correct, and if substantial evidence supports either of two conflicting factual conclusions, we are bound by the findings of the administrative tribunal.
In re Union Elec. Co. , 422 S.W.3d 358, 363-64 (Mo. App. W.D. 2013) (citations, internal quotation marks, and brackets omitted).
Whether we address purely legal issues as part of our "lawfulness" or "reasonableness" inquiries, we review those legal issues de novo , and "exercise[ ] independent judgment to correct erroneous interpretations." Mo. Pub. Serv. Comm'n v. Union Elec. Co. , No. SC96222, 552 S.W.3d 532, 539, 2018 WL 3235705, at *5 (Mo. banc July 3, 2018) (citations and internal quotation marks omitted).
Discussion
I.
In its first Point, KCP&L argues that the Commission's Report and Order was unlawful and unreasonable, because the Commission set rates employing overstated electricity sales figures, which failed to account for reductions in usage resulting from implementation of KCP&L's "Cycle 1" energy-efficiency program. We disagree.
As noted in our discussion of the relevant facts, the regulations promulgated by the Commission to implement MEEIA
*467 provide that a utility implementing an energy-efficiency program may include in its plan a mechanism for " '[r]ecovery of lost revenues' resulting from decreased electricity consumption." Union Elec. Co. , 552 S.W.3d 532, 534, 2018 WL 3235705, at *1 (footnote omitted). KCP&L's Cycle 1 energy-efficiency plan included a mechanism known as a "Throughput Disincentive-Net Shared Benefits" (or "TD-NSB") surcharge to account for lost revenues. KCP&L fashioned its TD-NSB mechanism on the mechanism included in an earlier energy-efficiency plan filed by Ameren (the plan which was at issue in the Missouri Supreme Court's Union Electric Company decision). In documents which were included in the record of KCP&L's rate case, Ameren explained that
[t]he implementation of energy efficiency programs causes a decrease in electricity sales, which causes the utility to lose revenue that it would have otherwise collected. But even more importantly, it prevents the utility from recovering a portion of its fixed costs. ... To fully align utility incentives such that the utility can partner with third party energy efficiency or conservation efforts, the throughput disincentive must be adequately addressed.
Ameren explained that the Throughput Disincentive surcharge was designed to "make[ ] the utility whole for the revenues it would have collected absent the implementation of its energy efficiency programs."
The Commission's Report and Order concluded that KCP&L's lost revenues attributable to the implementation of the Cycle 1 program "were already [fully ] accounted for through operation of the TD-NSB" surcharge contained in the Cycle 1 program itself, and that it "would result in double recovery of assumed lost revenues" to permit KCP&L an annualization adjustment in its general rate case for those same usage reductions. The Commission's conclusions are supported by substantial competent evidence, and were not arbitrary and capricious.
As the Missouri Supreme Court has recently observed, the terms of electric utilities' MEEIA plans are "dauntingly complex," and we venture into this arena with "some trepidation." Union Elec. Co. , 552 S.W.3d 532, 533, 536, 2018 WL 3235705, at *1, *3. Nevertheless, we conclude that the record supports the Commission's conclusion that lost revenues associated with KCP&L's Cycle 1 programs were fully and finally addressed by the Cycle 1 TD-NSB surcharge. First, the terms of the Cycle 1 Stipulation which defined the TD-NSB surcharge indicate that it was intended to compensate for lost revenues associated with particular energy-efficiency measures over the full useful life of those measures. Thus, the Cycle 1 Stipulation specifies that the TD-NSB surcharge was to constitute 26.36% of the "net shared benefits" accruing under the Cycle 1 program. "Net shared benefits," in turn, are defined in the Cycle 1 Stipulation as "the 2014 present value of avoided utility costs over the measures' lives less 2014 present value of all program[ ] costs." In addition, the Stipulation specifies that "[t]he energy and demand savings will be based on actual measures installed and tracked each month, and their associated deemed energy (kWh) and deemed demand (kW) savings and deemed lifetimes. " The emphasized language from the Stipulation suggests that the TD-NSB surcharge was designed to take account of electricity usage reductions occurring over the useful life of each energy-saving measure which was implemented during Cycle 1.
Expert witnesses testified during the trial of KCP&L's rate case that the Cycle *468 1 TD-NSB surcharge fully compensated KCP&L for the lost revenues associated with implementation of the Cycle 1 program. Thus, Staff witness John Rogers testified that KCP&L's Cycle 1 TD-NSB surcharge was modeled after the TD-NSB surcharge contained in Ameren's MEEIA plan, which expressly stated that it assumed no annualization of lost revenues in future rate cases.[3] Rogers testified at the evidentiary hearing that, rather than relying on later annualization during a rate case, the Cycle 1 TD-NSB surcharge "compensate[ed] the company up front for the entire throughput disincentive over the life of the measures." Rogers provided a detailed description of the workings of the Cycle 1 TD-NSB surcharge, emphasizing that it took account of the effect of Cycle 1 measures over their full useful lives:
[T]he way it really works is that every month when a measure is installed under Cycle 1, there's a calculation of the net shared benefit for that measure and all the measures that month, and the calculation goes like this: Measures installed through the DS [More computer] model. The benefits are calculated ... based upon the benefits, the net present value benefits over the life of the measure, minus the cost, that's the net shared benefit. Benefits minus cost.
Those benefits occur over the life of the measure. It may be 10 years or 15 years, whatever it is, but in the DS more [computer] model those benefits are all calculated over the life of the measure, not in the month, but over the life of the measure, and then their net present value and the costs are subtracted, and the company received 26.36 percent [as the TD-NSB surcharge]. Every month they booked that.
Rogers testified that, unlike the Cycle 2 plan, "the model [for the TD-NSB surcharge in Cycle 1] was designed and calculated to determine the net shared benefit without any annualization of the energy savings during rate cases."[4] Rogers emphasized that
Cycle 1 and Cycle 2 have distinctly different throughput disincentives. The company has been compensated already under the agreement for Cycle 1 their entire throughput disincentive. If they were to annualize savings again for Cycle 1 programs, they would actually be double recovering.
Similarly, Office of Public Counsel witness Geoff Marke testified that allowing KCP&L to annualize the usage reductions associated with Cycle 1 measures "would result in double recovery of assumed lost revenues."
Besides the wording of the Cycle 1 Stipulation, and the expert testimony described the design and operation of the Cycle 1 TD-NSB surcharge, the Commission's conclusion that no annualization adjustment was appropriate is also supported by contrasting the treatment of lost revenues in KCP&L's Cycle 1 and Cycle 2 MEEIA plans. Staff witness Rogers testified that the Cycle 1 and Cycle 2 Stipulations *469 "have distinctly different throughput disincentives." As the Commission recognized in the Report and Order, "[u]nlike the MEEIA Cycle 1 DSIM that relied upon the throughput disincentive feature of the DSIM for recovery of lost revenues, the MEEIA Cycle 2 Stipulation contemplated that lost revenues would be recovered through a revenue annualization in subsequent KCPL rate cases." The Cycle 2 Stipulation expressly provides for annualization only with respect to KCP&L's "active MEEIA programs." KCP&L has now abandoned the argument that Cycle 1 energy-efficiency measures which had energy-reducing effects during the test year constituted "active MEEIA programs" within the meaning of the Cycle 2 Stipulation. It thus concedes that its Cycle 1 energy-efficiency measures are not subject to annualization by virtue of the Cycle 2 Stipulation. In contrast to the Cycle 2 Stipulation, however, the Cycle 1 Stipulation does not authorize annualization. The lack of any authorization of annualization in the Cycle 1 Stipulation, when such authorization appears in the Cycle 2 Stipulation, is a significant indication that annualization is not authorized for energy efficiency measures implemented as part of Cycle 1.
KCP&L argues that the Commission used inaccurate, unadjusted electricity consumption information in formulating its rates. But the Commission reasonably concluded that KCP&L had agreed that the TD-NSB surcharge it received under the Cycle 1 Stipulation would constitute its full compensation for lost revenues as a result of the implementation of the Cycle 1 plan, and that it had also agreed that no annualization adjustment would be applied with respect to Cycle 1 energy efficiency measures in future rate cases. Given that KCP&L agreed to a particular treatment of lost revenues associated with the Cycle 1 program, it cannot now complain that the Commission refused to give it an additional concession to address those lost revenues. KCP&L's first Point is denied.
II.
In its second Point, KCP&L argues that the Commission's Report and Order erroneously determined that KCP&L's electric vehicle charging stations do not constitute "electric plant" within the meaning of § 386.020(14).
Whether KCP&L's charging stations constitute "electric plant" involves a question of "[s]tatutory construction [, which] is a matter of law." State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n , 331 S.W.3d 677, 683 (Mo. App. W.D. 2011). "On issues of law, we do not defer to the Commission but, instead, address the matter de novo. " In re Laclede Gas Co. , 417 S.W.3d 815, 819 (Mo. App. W.D. 2014) (citation omitted).
"Electric plant" is defined in § 386.020(14) to mean:
all real estate, fixtures and personal property operated, controlled, owned, used or to be used for or in connection with or to facilitate the generation, transmission, distribution, sale or furnishing of electricity for light, heat or power; and any conduits, ducts or other devices, materials, apparatus or property for containing, holding or carrying conductors used or to be used for the transmission of electricity for light, heat or power.
The Commission concluded that the electric vehicle charging stations do not constitute "electric plant" because, in the Commission's view, the stations "are not used for furnishing electricity for light, heat, or power." Instead, the Commission reasoned that
EV charging stations are facilities that use specialized equipment, such as a *470 specific cord and vehicle connector, to provide the service of charging a battery in an electric vehicle. The battery is the sole source of power to make the vehicle's wheels turn, the heater and air conditioner operate, and the headlights shine light. The charging service is the product being sold, not the electricity used to power the charging system.
The Commission's conclusion that the charging stations perform a "battery-charging service," rather than the "sale [or] furnishing [of] electricity for ... power," cannot withstand scrutiny. The Commission's Report and Order does not identify any service which KCP&L provides to customers in connection with the operation of its electric vehicle charging stations: it apparently does not clean or provide maintenance for its customers' vehicles; it does not provide vehicle parking or storage services along with the electricity; it does not entertain, feed or provide other facilities to customers while their vehicles charge; it does not even perform the physical service of connecting and disconnecting the vehicle from the charging station as part of the charging process.
The charging stations operate much like self-service gasoline stations. In the case of a self-service gasoline station, it would be unnatural to refer to the relevant transaction as "the service of filling the vehicle's fuel tank with gasoline"; instead, the more obvious and natural way to describe the transaction is as a sale of gasoline to a customer, for powering a motor vehicle. Moreover, it would be unnatural to state, in connection with a gasoline-powered automobile, that the fuel tank "is the sole source of power to make the vehicle's wheels turn, the heater and air conditioner operate, and the headlights shine light"; instead, what ultimately powers the vehicle is the gasoline sold by the self-service station-even though that gasoline is not consumed immediately upon purchase, but is instead stored in the fuel tank until later needed.
Just as in the case of a self-service gasoline station, what takes place at one of KCP&L's electric vehicle charging stations is not the service of charging a battery; instead, it is the sale of electricity to the vehicle owner, for use to power his or her electric vehicle. While the vehicle's batteries may store the purchased electricity temporarily until that electricity is needed to power the vehicle, the battery is merely a storage device-it is not "the sole source of power" driving the vehicle. Rechargeable batteries have become increasingly common in household and industrial applications, powering vehicles, large and small appliances, and cellular telephones, among many other devices. The fact that electricity is used to charge a battery, rather than to immediately operate a machine, does not convert the transaction into a "service," rather than a sale or furnishing of electricity for use as power. It is noteworthy that the Commission's Report and Order directed KCP&L to "file an amended tariff to revise the existing prohibition on the resale of electricity in order to clarify that EV charging stations are not reselling electricity." Thus, the Commission itself recognized that without this tariff revision, proprietors of electric vehicle charging stations would be prevented from operating, since their actions would constitute the prohibited "resale" of electricity they purchased from KCP&L.
The Commission also emphasized that the electric vehicle charging stations use "specialized equipment, such as a specific cord and vehicle connector." The definition of "electric plant" includes all "personal property ... used ... to facilitate the ... distribution, sale or furnishing of electricity"; this definition would appear to comprehend even "specialized equipment" employed *471 to sell or distribute electricity. In any event, we fail to see how the use of "specialized equipment" distinguishes electric vehicle charging stations from other circumstances in which KCP&L sells or furnishes electricity. In connection with the sale of electricity to residential and business establishments, KCP&L employs various types of wiring and conduit, transformers, insulators, metering equipment, and connectors. That equipment is "specialized" depending on the voltage, current, or phase of the electricity being transported, and the type of equipment to which the electricity is being supplied. Electric vehicle charging stations are not distinctive in this regard.
The Commission reasoned that KCP&L's charging stations were comparable to electric clothes dryers in a laundromat; it stated that "a laundromat uses electricity to provide clothes drying services, but that does not mean the laundromat's dryers are electric plant." The analogy to electric clothes dryers is unpersuasive. In the case of a laundromat, the proprietor-not the customer-owns and maintains the electric-powered equipment, as well as the facility in which the equipment is housed. The customer is merely permitted to use the proprietor's electric-powered equipment, in the proprietor's facility, to perform a specific task. The customer is not purchasing electricity from the laundromat; instead, he or she is purchasing the use of a clothes dryer in a facility furnished to permit the customer to do their laundry. The self-service charging of a customer's electric vehicle is completely different. The customer-not KCP&L-owns and maintains the electricity-consuming machine; and the customer operates that machine away from KCP&L's charging station, for the customer's own purposes. The charging station customer purchases nothing from KCP&L other than electricity.
The Commission argued that, if it found that KCP&L's electric vehicle charging stations constituted "electric plant," it would be required to regulate other "similar" battery-charging services, such as "smart phone charging stations or kiosks, RV parks that allow vehicles to connect to the park's electricity supply, or airports that connect plans to a hangar's electricity supply while parked." Once again, we find the Commission's reasoning unpersuasive. At least with respect to recreational vehicle parks and airports, the provision of electricity to a customer is plainly ancillary to other services offered by the business proprietor-namely, the rental of a space in which to park or store a vehicle, along with other amenities. In addition, because the electricity is supplied solely to persons who otherwise rent the business' parking or storage space, the electricity is not being offered for "public use" because it is not "indiscriminately and reasonably made available to the general public"; it therefore would not trigger Commission jurisdiction. Hurricane Deck Holding Co. v. Pub. Serv. Comm'n , 289 S.W.3d 260, 264 (Mo. App. W.D. 2009) (citation omitted); cf. Cook Tractor Co. v. Dir. of Revenue , 187 S.W.3d 870, 874-75 (Mo. banc 2006) (dealer in large farm and construction equipment did not constitute a "common carrier" because it did not offer its equipment-hauling services to the general public, but instead made "announcements at its public [equipment] auctions that it was available to haul goods for purchasers").[5]
*472 The Commission cited a number of policy rationales to exclude electric vehicle charging stations from the definition of "electric plant." For example, the Commission expressed its concern that, if it recognized charging stations as "electric plant": the large number of ratepayers who do not operate electric vehicles would end up subsidizing the automobile usage of the small number of electric vehicle owners; KCP&L would be given a competitive advantage over non-utility operators of similar charging stations; and KCP&L would construct wasteful and unnecessary facilities, because it would not face the same risk of monetary loss that unregulated entities experience.
While the Commission's policy concerns may be well-founded, nothing in the statutory definition of "electric plant" authorizes the Commission to exclude equipment from the definition based on such concerns.
Under bedrock principles of statutory construction, we cannot incorporate unwritten conditions, exceptions, or limitations into [the statute's] unambiguous command. The Missouri Supreme Court has emphasized that " '[t]his Court may not engraft upon the statute provisions which do not appear in explicit words or by implication from othe[r] words in the statute.' " Courts "cannot supply what the legislature has omitted from controlling statutes"; instead, we "enforce[ ] statutes as they are written, not as they might have been written." Under these fundamental principles, "[w]here no exceptions are made in terms, none will be made by mere implication or construction."
In Interest of J.L.H. , 488 S.W.3d 689, 696 (Mo. App. W.D. 2016) (en banc) (citations omitted).
In addition, even if electric vehicle charging stations are recognized to be "electric plant," this does not leave the Commission without mechanisms to address the concerns expressed in its Report and Order. Where particular utility activities fall within the Commission's regulatory jurisdiction, the Commission has the authority to review the prudence of those activities; it may have authority to approve or disapprove particular expenditures before they occur; and it may have the ability through rate-design mechanisms to specify that the costs of particular activities will be borne solely by particular classes of ratepayers. We find it significant that, in the Kansas Corporation Commission decision cited by the Commission, the Kansas agency did not find that the operation of KCP&L's electric vehicle charging stations was not a "public utility function" under K.S.A. §§ 66-101a and 66-104 ; instead, the Kansas Commission found that the charging stations which KCP&L sought to install were not necessary "to furnish reasonably efficient and sufficient service and facilities" to its customers, as required by K.S.A. § 66-101b.[6] Confirming that it did not wholly lack regulatory authority, the Kansas Commission later approved a tariff specifying the rates KCP&L could charge for the electricity sold through its charging stations,[7] over an objection that KCP&L should operate the stations "as an unregulated *473 service."[8] Our conclusion that KCP&L's electric vehicle charging stations constitute "electric plant" within the meaning of § 386.020(14) does not leave the Commission without remedy; to the contrary, it provides a basis for the Commission to exercise its full range of regulatory authorities with respect to those stations.[9]
Because we conclude that the Public Service Commission erroneously concluded that KCP&L's electric vehicle charging stations did not constitute "electric plant" within the meaning of § 386.020(14), we reverse that portion of the Commission's Report and Order, and remand the matter to the Commission for further proceedings consistent with this opinion.
Conclusion
The Public Service Commission's Report and Order is affirmed in part and reversed in part, and the case is remanded to the Commission for further proceedings consistent with this opinion.
All concur.

Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2017 Supplement.

We recognize that the Commission's Report and Order does not explicitly cite to Rogers' live testimony. The Report and Order does, however, extensively cite to and rely on Rogers' pre-filed surrebuttal testimony concerning the Cycle 1 TD-NSB surcharge, and it is evident that the Commission credited Rogers' testimony with respect to the issues raised in KCP&L's first Point.

Rogers' pre-filed surrebuttal testimony made the same assertion: "KCPL's Cycle 1 TD-NSB Share was agreed to as part of the Cycle 1 Stipulation and is designed to compensate KCPL for the entire amount of KCPL's through-put disincentive due to Cycle 1's deemed measures without any annualization of kWh sales in its general rate cases." (Footnote omitted.)

No party has argued in this case that any of KCP&L's electric vehicle charging stations are not "made available to the general public" because of the specific manner in which vehicle charging is offered at particular stations. If particular charging stations do not make electricity "publicly available" in the relevant sense, that issue can be addressed on remand.

In the Matter of KCP&L's Application to Deploy and Operate its Proposed Clean Charge Network , No. 16-KCPE-160-MIS, 2016 WL 4989935 at *5 ¶ 14 (Ks. Corp. Comm'n Sept. 13, 2016).

In the Matter of KCP&L's Application to Deploy and Operate its Proposed Clean Charge Network , No. 16-KCPE-160-MIS, 2016 WL 6436734 at *5 (Ks. Corp. Comm'n Oct. 27, 2016).

Id. at *3 ¶ 11.

The Commission's regulatory authorities include the authority to review and approve the rates charged for electricity sold through the charging stations, which would presumably take account of the costs of constructing, maintaining, and operating those stations. See §§ 393.130, 393.140. We were informed at oral argument that KCP&L does not provide electricity gratuitously to electric vehicle owners at the charging stations it currently operates, but that the costs of the electricity are instead borne by the vehicle operator, or by the owner of the property which "hosts" a particular station.